UNITED STATES of America, Appellee,

v.

**Mauricio LONDONO–VILLA, Defendant–Appellant.**

No. 298, Docket 90–1339.

United States Court of Appeals, Second Circuit.

Argued Nov. 5, 1990.

Decided April 10, 1991.

Elizabeth Glazer, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty. for the Southern District of New York, Alan M. Cohen, Asst. U.S. Atty., New York City, on the brief), for appellee.

Richard M. Asche, New York City (Jack T. Litman, Russell M. Gioiella, Scott B. Tulman, Litman, Asche, Lupkin & Gioiella, New York City, on the brief), for defendant-appellant.

Before KEARSE, MAHONEY, and McLAUGHLIN, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Mauricio Londono–Villa ("Londono") appeals from a judgment entered in the United States District Court for the Southern District of New York, following a jury trial before Peter K. Leisure, *Judge,* convicting him on one count of conspiring to import cocaine into the United States in violation of 21 U.S.C. §§ 952(a), 960, and 963 (1988), and one count of aiding and abetting the importation of cocaine in violation of 21 U.S.C. §§ 952(a) and 960, and 18 U.S.C. § 2 (1988). On the aiding and abetting count, he was sentenced principally to 10 years' imprisonment, to be followed by five years of supervised release; on the conspiracy count, the court suspended the imposition of sentence and imposed a five-year term of probation, to run concurrently with the term of supervised release. On appeal, Londono contends chiefly that there was no evidence that he knew or intended the destination of the cocaine to be the United States, and that the district court erred in instructing the jury that it could find him guilty without finding that he had such knowledge or intent. For the reasons below, we agree and reverse the judgment of conviction.

## I. BACKGROUND

The government's evidence at trial was presented principally through the testimony of Drug Enforcement Administration ("DEA") undercover agent Rene de la Cova and DEA confidential informant Frank Kelly. To the extent pertinent to Londono, the testimony was as follows.

In March and April 1987, several individuals, including codefendant Nelson Cuevas–Ramirez, unindicted coconspirator Alvaro Soler–Romero ("Soler"), and de la Cova, met several times in Panama City, Panama, to discuss a plan to transport 100–200 kilograms of cocaine from Colombia through Panama, to the United States. The plan called for Kelly, de la Cova's pilot, to fly from Panama to Colombia to pick up the shipment of cocaine from a small airstrip there; he would then return to Panama, and the cocaine would eventually be taken to the United States from Panama.

On April 11, Londono accompanied Soler to Panama for the last of these meetings. Londono was to fly with Kelly from Panama to Colombia the next morning to guide him to the Colombian airstrip, taking a roundabout route so that Kelly would not be able to locate it again. Londono was familiar with the location of the airstrip, which he had used many times, and he assured de la Cova that it was safe. When Kelly flew back to Panama, Londono was to remain in Colombia.

The flight to Colombia was delayed by mechanical problems, and de la Cova testified that Londono chafed at the delay, saying that he had undertaken this task as a favor and that he actually worked for an

associate of one of the other conspirators. Londono and Kelly finally left for Colombia on April 13. When they arrived at the airstrip, two teenage boys delivered four burlap bags to the airstrip. Londono examined the bags to verify that they contained cocaine and noticed that there were only 110 kilograms instead of the expected 150. The boys explained to Londono that because the airplane had been delayed, they had already sent the rest off. Kelly tried to get Londono to return with him to Panama to explain the shortage, but Londono promised instead to telephone the other conspirators in Panama to alert them that Kelly was not responsible for the shortfall. Londono helped to load the cocaine into the airplane, and Kelly flew off to Panama, Londono remaining in Colombia.

The cocaine was eventually transported to the United States. There was no testimony that Londono participated in any of the negotiations for the cocaine transaction and no testimony that the United States was mentioned in his presence. Although de la Cova testified that Panama is commonly used as a transshipment point for narcotics from Colombia to the United States, he also testified that Panama is used as a transshipment point for drugs to be sent to many other countries as well.

At the close of the evidence, Londono asked the court to instruct the jury that, in order to establish his guilt of importing and conspiring to import the cocaine into the United States in violation of 21 U.S.C. §§ 952, 960, and 963, the government was required to prove beyond a reasonable doubt that he knew or intended the destination of the cocaine to be the United States. The district court initially declined to include in its charge any instruction whatever with respect to a knowledge or intent requirement. Instead, it charged the jury, in pertinent part, as follows:

In order to find another person unlawfully imported cocaine into the United States, you must be satisfied beyond a reasonable doubt that the following elements have been satisfied.

First, that on or about the date set forth in the indictment, the defendant imported or caused to be imported into the United States a controlled substance. Second, that the imported substance at some point came into the Southern District of New York. Third, that the substance involved was approximately 111 kilograms of cocaine.

To import means to bring in or introduce an article. To find the defendant guilty ... you must find beyond a reasonable doubt that another person brought or caused to be brought into the United States approximately 111 kilograms of cocaine.

. . . .

The second element of this offense requires that the imported substance actually came into the Southern District of New York at least for a time. Because the law provides that importation is a continuous offense you may find this location requirement satisfied as long as the substance came into the Southern District of New York.

During deliberations, the jury requested clarification as to whether the government was required to prove, for both the conspiracy charge and the aiding and abetting charge, that Londono knew the destination of the cocaine was the United States. The court responded by sending into the jury room the portions of the original instructions concerning conspiracy and aiding and abetting. The jury subsequently sent another note to the court, again asking whether a defendant had to know that cocaine was to be imported into the United States in order to be found guilty of aiding and abetting. In response, the court gave the jury a supplemental instruction stating that "the defendant need not have specific knowledge that the cocaine was to be imported into the United States." The jury thereafter found Londono guilty on both counts.

Following the verdict, Londono moved pursuant to Rules 29(c) and 33 of the Federal Rules of Criminal Procedure for a judgment of acquittal or a new trial, renewing his contention that the government was

required to prove beyond a reasonable doubt that he knew or intended that the United States was to be the destination of the drugs, and arguing that there was no such proof. The district court denied the motion in an opinion reported at 735 F.Supp. 543 (1990), holding that the reference to the United States in § 952 is merely jurisdictional language, and that "whether or not read in light of § 960, [it] does not require the government to prove that the defendant specifically intended the controlled substance to be imported into the United States." 735 F.Supp. at 546.

London was sentenced as indicated above, and this appeal followed.

## II. DISCUSSION

█ On appeal, Londono pursues his contention that in order to convict a defendant of importation of narcotics under 21 U.S.C. §§ 952 and 960, or conspiracy to import narcotics under 21 U.S.C. § 963, the government must prove beyond a reasonable doubt that the defendant knew or intended that the narcotics would be imported into the United States. He argues that he is entitled to a dismissal of the indictment because the government's evidence was insufficient to prove that element, or at least to a new trial because the trial court's instructions were erroneous. We agree that Londono's conviction must be reversed and the indictment dismissed.

### A. The Offenses of Importation and Conspiracy To Import

Section 952 provides that, except to the extent that the Attorney General of the United States may permit for medical, scientific, or other legitimate purposes, "[i]t shall be unlawful ... to import into the United States from any place outside thereof, any controlled substance." 21 U.S.C. § 952(a). The term "import" is defined as "any bringing in or introduction of [an] article into any area (whether or not such bringing in or introduction constitutes an importation within the meaning of the tariff laws of the United States)." 21 U.S.C. § 951(a)(1) (1988). Section 960(a) provides, in pertinent part, that

[a]ny person who—

(1) contrary to section 952 ... of this title, knowingly or intentionally imports ... a controlled substance,

.    .    .    .    .

shall be punished as provided in subsection (b) of this section.

21 U.S.C. § 960(a)(1). Section 960(b) sets out a range of penalties, varying with the nature and quantity of the drugs, for "a violation of subsection (a) of this section."

Section 952(a) itself contains no penalty provision; the only penalty for conduct within the purview of that section is the penalty provided in § 960(b) for violation of § 960(a). Section 960(b) also indirectly provides the penalty for conspiracy to import narcotics in violation of § 963. The latter section provides that

[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 963.

The government contends that Londono's conviction should be affirmed on the ground that § 960 does not inject a knowledge or intent requirement into the offense, arguing that "[s]ection 960 merely prescribes the penalties for the conduct that Section 952 outlaws." (Government brief on appeal at 15.) We disagree. We think it plain that § 960(a) is part of the definition of the criminal offense of importation into the United States, for the statute does not provide any penalty whatever for violation of § 952(a) alone. The penalty section, § 960(b), provides punishment only for "a violation of subsection (a) of this section," i.e., for violation of § 960(a); and § 960(a) makes the § 960(b) penalties applicable to importation of controlled substances only when the importation prohibited by § 952(a) is done "knowingly or intentionally." In short, to be a punishable offense, the importation must be knowing or intentional.

The government alternatively contends that because the words "into the United States" do not appear in § 960, the knowledge/intent requirement in that section does not apply to the destination of the controlled substance; it argues that the knowledge requirement is designed merely to exclude persons who come into innocent possession of controlled substances, such as a traveler who inadvertently picks up another's luggage containing narcotics. Though we agree that such innocent persons are excluded, we do not agree that the exclusion is so limited.

Both in common parlance and in the statutory definition, the term "import" carries a connotation not just of movement of goods but of their entry into a given area. The "knowingly or intentionally imports" language chosen by Congress implies that, to be guilty of a criminal offense under §§ 952 and 960, the defendant must have known or intended the area into which the goods were to enter. The choice of this formulation suggests that Congress did not intend us to interpret these sections in a way that divorces the knowledge/intent element from the connotation of the word "import." Further, if Congress had intended to reach every person outside of the United States who aids the movement of drugs into the United States without knowing their destination, and had meant the knowledge/intent element to except only an unwitting carrier, it had any number of clear and simple ways—some of which it used in other sections—to express such an intention. For example, it would have been a relatively straightforward task to have the relevant part of § 960(a) read "Any person who violates § 952, knowing or having reasonable cause to believe the shipment contains a controlled substance...." Compare 21 U.S.C. § 960(d) (prohibiting the knowing or intentional importation of precursor chemicals "knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance"). Alternatively, since, with exceptions not pertinent here, Congress outlawed the exportation of controlled substances from the United States generally without regard to destination, see

21 U.S.C. § 953 (1988) (prohibiting "export[ation of narcotic drugs] from the United States"), if it had wished also to prohibit importation without regard to the defendant's knowledge of the country of destination, it could simply have added "or from any other country" to § 953. Or it could have used the approach it adopted in 21 U.S.C. § 959 (1988), which prohibits a person from manufacturing or distributing controlled substances intending their import into the United States; § 959(c) provides that "[t]his section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States."

In light of Congress's conjoining the knowledge/intent requirement with the term "import," and in light of its failure to use one of its other formulations that would plainly reach all actors outside of the United States who contribute to the international movement of narcotics regardless of their knowledge or intent as to destination, we are persuaded that in order to establish the offenses defined in §§ 952, 960, and 963, the government is required to prove that the defendant knew or intended that the destination of the narcotics would be the United States.

We find nothing in the legislative history of §§ 952, 960, and 963 that suggests the contrary conclusion. These sections were enacted as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, P.L. 91–513, 84 Stat. 1236, codified as amended, 21 U.S.C. §§ 801–971 (1988) (the "Act"). The Act was part of an effort "to deal in a comprehensive fashion with the growing menace of drug abuse in the United States...." H.R.Rep. No. 1444, 91st Cong., 2d Sess. 1, reprinted in 1970 U.S. Code Cong. & Admin.News 4566, 4567. As to the specific sections of the Act, the legislative history contains no discussion beyond a repetition of the substance of the sections themselves. In the Act itself, Congress made general reference to the Convention on Psychotropic Substances, February 21, 1971, 32 U.S.T. 543, T.I.A.S. No. 9725, see 21 U.S.C. § 801a, an international accord intended to promote coordinated in-

ternational efforts to combat drug trafficking, and stated that the Act gave recognition to, *inter alia*, the facts that "[a] major portion of the traffic in controlled substances flows through interstate and foreign commerce," 21 U.S.C. § 801(3), and that "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people." *Id.* § 801(2). We recognize that the threat to the "health and general welfare of the American people" is imminent as soon as the forbidden substances arrive in this country, even if the drug trafficker meant them to go elsewhere. The same, of course, could be said of narcotics brought here by an unwitting carrier. The fact remains that, as it structured the sections of the Act, Congress made a violation of § 952 punishable only if the "import[ation]" was knowing or intentional. We do not see in the Act or in the legislative history any indication that Congress intended to punish under §§ 952, 960, and 963 every person who contributes to the international movement of narcotics from a foreign country without regard to his knowledge or intent as to the country into which the importation is to occur.

Most of the other circuits that have confronted the question before us have concluded as we do that, in order to prove a violation of §§ 952 and 960, the government must establish that the defendant knew the narcotics were to be imported into the United States. The cases whose facts are perhaps closest to those before us are *United States v. Conroy*, 589 F.2d 1258 (5th Cir.), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979), and *United States v. Bollinger*, 796 F.2d 1394 (11th Cir.1986), *modified on other grounds*, 837 F.2d 436, *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988). In *Conroy*, the defendants were charged with conspiracy to import marijuana into the United States. The United States Coast Guard intercepted their ship carrying the marijuana off the coast of Haiti. One of the defendants was one Walker, all of whose relevant conduct took place outside of the United States. Walker conceded that he had loaded the drugs onto the ship some 40 miles off the coast of Jamaica, but he maintained that he thought the ship was bound for Canada, not the United States. The Fifth Circuit stated that in order to convict Walker of conspiring to violate § 952, the government was required to "show[ ] that the conspiracy to import was directed at the United States," and to show that "Walker kn[e]w the destination of the cargo." 589 F.2d at 1270. The court reasoned as follows:

> [I]f it be assumed that Walker indeed planned only to cooperate in the export of marijuana [from Jamaica] to *Canada*, there would be no criminal intent on his part cognizable in an American court and no federal interest involved. The importation of marijuana into Canada may or may not violate Canadian law. Even if it does, the question might be raised whether the Congress has the power, as a matter of due process, to make criminal a conspiracy entered into abroad directed only against another foreign country. We need not reach that question here for Congress has shown no intention even by remote implication to punish a person who in some other nation conspires against the laws of a third nation. Therefore, Walker's conviction on the conspiracy count necessarily must be supported by proof that he knew the marijuana was destined for the United States.

*Id.* (emphasis in original). The evidence against Walker included testimony that the ship was in fact bound for Connecticut or elsewhere on the east coast of the United States, that the name of the ship was in English, that most of the crew members were American, that Walker had joined the other defendants on the ship after the marijuana was loaded, and that he had had numerous telephone conversations with codefendants who were in the United States. Thus, the court affirmed Walker's conviction because it found there was sufficient evidence of his knowledge that the ship was in fact bound for the United States.

In *United States v. Bollinger*, one Cruz–Barrientos, a pilot, was charged with a § 963 conspiracy for flying cocaine from Bolivia to Honduras; the cocaine was eventually bound for the United States. The court found the question of "whether [Cruz–Barrientos] participated with knowledge that the cocaine was to be transported to the United States," 796 F.2d at 1404, a difficult one since there was no evidence that any coconspirator ever mentioned that the United States was the destination in Cruz–Barrientos's presence. The court concluded that the evidence was sufficient, however, because Cruz–Barrientos knew that the plane he was to fly had to be brought to Honduras from the United States, all of the coconspirators with whom he dealt lived in the United States and were to return there after the plane was brought to Honduras, and all of the planning of the importation scheme, including Cruz–Barrientos's own participation in the planning, had taken place in the United States. *Accord United States v. Richeson*, 825 F.2d 17, 21 (4th Cir.1987) (evidence sufficient to support inference that Pakistan resident whose relevant conduct took place there, "sold heroin to [American codefendant and his employee] with knowledge that it was to be imported into the United States"); *United States v. Marsh*, 747 F.2d 7, 13 (1st Cir.1984) (remanding, after bench trial, for determination of whether government established beyond a reasonable doubt that defendants, captured on the high seas, "knew that the United States was the destination of the contraband").

The government argues that two other First Circuit cases, *United States v. Mejia–Lozano*, 829 F.2d 268 (1st Cir.1987), and *United States v. Franchi–Forlando*, 838 F.2d 585 (1st Cir.1988), have ruled that § 952 does not contain an intent element. The facts of those cases do not parallel those here, and the language relied on by the government was not necessarily a holding. In both cases, the defendants were traveling by airplane from one foreign country to another, transporting narcotics in their luggage; they actually brought the narcotics into the United States when the airplanes on which they were traveling

landed in Puerto Rico. During those stops, customs agents found the drugs. Although the *Mejia–Lozano* court stated that "[n]othing in § 952(a) makes the accused's knowledge that she was landing on American soil, or her intent to do so, an element of the offense" of importation, 829 F.2d at 271, the court was nonetheless careful to note that the defendant's boarding the plane was voluntary, *id.* at 272 (defendant "selected the flight" and "boarded it without demonstrable duress"), and that the stop in Puerto Rico was scheduled, *id.* at 270 n. 1 ("[h]aving carefully reviewed the record ... we conclude that the jury could reasonably have inferred that the touchdown in Puerto Rico was a planned one rather than a forced landing or other unforeseen deviation"). Similarly, the *Franchi–Forlando* court noted that the stop was a scheduled one, and stated that "[r]egardless" of the *Mejia–Lozano* statement that intent was not an element, "we believe that the jury could conclude from the facts that the trip was long, the stops were few, and the stop was scheduled that appellant knew he would land in the United States." 838 F.2d at 587. Thus, in both cases, there was in fact adequate proof of intent, for it is generally permissible to infer that a person intends the ordinarily foreseeable consequences of his or her actions. *See, e.g., Francis v. Franklin*, 471 U.S. 307, 314–15, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985); *Payne v. LeFevre*, 825 F.2d 702, 707–08 (2d Cir.), *cert. denied*, 484 U.S. 988, 108 S.Ct. 508, 98 L.Ed.2d 506 (1987). When a person carrying drugs has voluntarily traveled on an airplane that was scheduled to stop in the United States, we see no reason why a jury may not infer that he or she knowingly or intentionally entered the United States with the drugs.

We are also unpersuaded by the government's contention that a reversal here would permit a person participating in the shipment of narcotics to the United States from another country to escape liability in the United States so long as he could claim ignorance as to the shipment's destination. We see no reason why such a person could not be tried on a conscious-avoidance theo-

ry. *See, e.g., United States v. Lanza,* 790 F.2d 1015, 1022 (2d Cir.) (conscious-avoidance instruction is appropriate when a defendant claims to lack "some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance"), *cert. denied,* 479 U.S. 861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986). Though such a theory cannot be used to establish the individual's membership in the conspiracy, *see, e.g., id.,* where there is sufficient evidence of that membership, a conscious-avoidance instruction may be used to permit the jury to convict if it finds that the defendant deliberately attempted to remain ignorant of the conspiracy's precise goals, *see, e.g., id.; United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1195 (2d Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). In any event, if there were a lacuna in the law, it would not be the province of the courts to fill it by ignoring the language and interrelationship of §§ 952 and 960; it would be the prerogative of Congress to decide whether to enact legislation to fill it.

### B.  *The Evidence of Knowledge or Intent*

■ In light of our conclusion that the government was required to prove that Londono knew the cocaine delivered to Kelly in Colombia for the return trip to Panama was destined for the United States, it is clear that the trial court's instructions to the jury were not correct. The original instructions did not mention a knowledge or intent element; the supplemental instructions stated that the jury did not have to find that Londono had knowledge that the United States was to be the destination in order to convict. Accordingly, Londono is entitled at least to a new trial. Moreover, if the evidence at trial was not sufficient to permit even a properly instructed jury to find him guilty, he is entitled to a reversal and to dismissal of the indictment. *See, e.g., Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). We conclude that the evidence was insufficient.

The testimony showed that Londono was not involved in any of the lengthy negotiations for the sale of the cocaine; he was not present at most of the meetings but rather came into the picture only at the end, in order to serve as a guide for the informant-pilot who was to pick up the cocaine in Colombia and take it back to Panama. There was no evidence that Londono had been told that the United States was to be the ultimate destination of the cocaine, and no evidence that the United States was ever mentioned in his presence. The testimony that Panama is sometimes used as a transshipment point when drugs are ultimately intended for importation into other countries, including the United States, was not sufficient to permit the jury to find that Londono knew or should have known that this cocaine was intended for shipment to the United States.

The government has not called to our attention any evidence from which the jury could have inferred beyond a reasonable doubt that Londono knew the cocaine was bound for the United States. Our own review of the transcript satisfies us that the government has not overlooked any such evidence.

### CONCLUSION

We have considered all of the government's arguments in support of its interpretation of §§ 952 and 960 and have found them to be without merit. The judgment of conviction is reversed with respect to both counts, and the matter is remanded for dismissal of the indictment.

McLAUGHLIN, Circuit Judge, dissenting:

I concede that the statutory scheme embodied in 21 U.S.C. §§ 952(a) and 960(a) is not a paragon of clarity. That said, I nonetheless believe that when viewed through the prism of the congressional purpose behind the Comprehensive Drug Abuse Prevention and Control Act of 1970 ("the Act"), 21 U.S.C. § 801 *et seq.* (1988), the majority's interpretation is inappropriate. I, therefore, respectfully dissent.

Section 952(a) of the Act defines the crime. The entry of controlled substances onto American soil causes the harm and

furnishes the jurisdictional basis for punishment of the offender. Section 952(a) makes no mention of a specific intent. Section 960(a) penalizes those who violate section 952; but by adding a specific *mens rea* requirement, section 960(a) limits the universe of individuals who may be punished, thereby protecting the innocent traveller who unwittingly brings a controlled substance into the United States.

Section 960(a) provides that a defendant violates section 952 when he "knowingly or intentionally imports" a controlled substance. The majority reads this as if it read, "knowingly or intentionally imports *into the United States* ...," and it does this by interpreting the verb "import" to imply "into the United States," which, of course, is its clear meaning in section 952. The point, however, is that the phrase "into the United States" does not appear in section 960(a), and the adverbs "knowingly or intentionally" appearing in section 960(a) modify only the verb "import."

To make the adverbial phrase modify the missing words "into the United States" the majority holds that the very word "import" must, in context, imply "into the United States." It is here that I part company with the majority, on both semantic and policy grounds.

As a matter of statutory construction, the majority's interpretation ignores the express definition of the term "import", which requires only a "bringing in or introduction of [the controlled substance] *into any area....*" 21 U.S.C. § 951(a)(1) (emphasis added). It also distorts the statutory scheme of Title 21 by effectively reading the phrase "into the United States" out of section 952(a). *See Moskal v. United States,* —— U.S. ——, 111 S.Ct. 461, 466, 112 L.Ed.2d 449 (1990) (each word or phrase of a statute should be given meaning).

As I interpret sections 952(a) and 960(a), the phrase, "into the United States," appearing in section 952(a) is for jurisdictional purposes only, i.e., the physical situs of the crime must be in the United States. The crime, therefore, is committed when an individual, with the criminal intent described

in section 960(a), introduces a controlled substance *"into any area,"* and that "area" happens to be the United States. *See, e.g., United States v. Mejia–Lozano,* 829 F.2d 268, 271 (1st Cir.1987). On numerous occasions, this court, as well as our sister circuits, has found that similar statutory language, which is necessary to define a federal crime, is jurisdictional only, and does not constitute any part of the *mens rea* of the crime. *See, e.g., United States v. Eisenberg,* 596 F.2d 522, 526 (2d Cir.) (under 18 U.S.C. § 2314, knowledge that securities transported in interstate commerce not necessary), *cert. denied,* 444 U.S. 843, 100 S.Ct. 85, 62 L.Ed.2d 56 (1979); *United States v. Green,* 523 F.2d 229, 233–34 (2d Cir.1975) (under 18 U.S.C. § 659, "knowledge of interstate or foreign character of the goods" not required), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976); *see also United States v. Hattaway,* 740 F.2d 1419, 1427 (7th Cir.) (collecting cases), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984).

I agree with the majority that the dispositive question here is whether Congress intended to legislate to the fullest extent of its power. Did Congress intend to use all means at its disposal to thwart drug trafficking? If so, then the "into the United States" language should be interpreted only as the required jurisdictional nexus. On the other hand, if Congress intended to limit the scope of the legislation to those who actually intended to cause harm in the United States, the easiest way to accomplish this would have been to include, as an element of the crime, knowledge or intent that the controlled substance reach the United States. *See United States v. Feola,* 420 U.S. 671, 676 n. 9, 95 S.Ct. 1255, 1260 n. 9, 43 L.Ed.2d 541 (1975) ("[t]he question ... is not whether the requirement is jurisdictional, but whether it is jurisdictional only").

It seems clear to me that Congress resolved to exert all means at its disposal to combat drug trafficking. The House Report accompanying the Act states that the "legislation [was] designed to deal in a comprehensive fashion with the growing

menace of drug abuse in the United States ... (2) through providing more effective means for law enforcement aspects of drug abuse prevention and control...." H.R. Rep. No. 1444, 91st Cong., 2d Sess. 116, *reprinted in* 1970 U.S.Code Cong. & Admin.News 4566, 4567. In preparing this House Report, the Interstate and Foreign Commerce Committee of the House of Representatives quoted at length from a report by the Prettyman Commission, a presidential commission appointed to study narcotics and drug abuse. First among the Prettyman Commission's three-point general philosophy was the following: "The illegal traffic in drugs should be attacked with the full power of the Federal Government. The price for participation in this traffic should be prohibitive. It should be made too dangerous to be attractive." *Id.* at 4575 (quoting Report of President's Advisory Commission on Narcotic and Drug Abuse (1963)); *see also United States v. Palella,* 846 F.2d 977, 980 (5th Cir.) (the Act represents "a comprehensive scheme designed to suppress and, hopefully, ultimately terminate the illegal distribution of drugs from whatever source, foreign or domestic"), *cert. denied,* 488 U.S. 863, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988); *United States v. Baker,* 609 F.2d 134, 137 (5th Cir.1980) (the Act represents a congressional effort "to eradicate all illegal drug trafficking").

Evidence of Congress' expansive purpose can also be gleaned from the sheer breadth of several other provisions in the Act, particularly section 959. 21 U.S.C. § 959. That section—concededly not at issue here—clearly proscribes acts of manufacture and distribution of controlled substances *anywhere.* Certainly legislation with such sweeping extraterritorial consequences evinces a congressional intent to approach the high-water mark of its authority to prevent illicit drug trading. Additionally, it is not without significance that section 959 clearly and categorically requires knowledge or intent that the controlled substances enter the United States, suggesting that when it intended that a

defendant had to know the destination of the controlled substance, Congress knew how to communicate that idea.

The majority questions why, if Congress intended the reading that I envision, it did not add to either section 952 or 960(a) an Olympian statement similar to that in, for example, section 959(c).[1] I cannot, of course, speak for the congressional mindset. One answer, however, is that no further statement was needed because the phrase "into the United States" had already been inserted into section 952 to provide the jurisdictional basis for proscribing importation. Further, the majority agrees that sections 952 and 960(a) apply to extraterritorial acts; the question is whether those acts must be accompanied by an intent to cause harm in the United States. Thus, simply mimicking the words of section 959(c) in either section 952 or 960(a) would not have served any clear congressional purpose.

It is also noteworthy that American treaty obligations require the United States to cooperate with other signatories in suppressing international drug trafficking. *See* Single Convention on Narcotic Drugs, March 30, 1961, 18 U.S.T. 1407, T.I.A.S. 6298 (ratified by U.S. in 1967). Congress has expressed its intent to fulfill these obligations. *See* 21 U.S.C. § 801(7); *see also United States v. Muench,* 694 F.2d 28, 32 (2d Cir.1982) ("Congress has expressly declared that the drug laws are in part intended to meet the United States' duties under [its] treaties"), *cert. denied,* 461 U.S. 908, 103 S.Ct. 1881, 76 L.Ed.2d 811 (1983).

This impressive body of evidence satisfies me that Congress intended to use all methods at its disposal to eradicate drug abuse in the United States. Such pervasive and persuasive evidence of congressional purpose resolves the ambiguity in the statutory scheme. Additionally, it serves to trump an application of the rule of lenity. The Supreme Court has noted that when legislative history indicates a broad congressional purpose, statutory language that might otherwise be ambiguous should

---

1. Section 959(c) provides: "This section [959] is intended to reach acts of manufacture and dis-

tribution outside the territorial jurisdiction of the United States." 21 U.S.C. § 959(c).

be interpreted in line with that purpose; and, in those cases, the rule of lenity will not provide a safe harbor from criminal liability. *See Moskal,* 111 S.Ct. at 465–68; *McElroy v. United States,* 455 U.S. 642, 655–58, 102 S.Ct. 1332, 1339–41, 71 L.Ed.2d 522 (1982).

Common sense dictates that in order to fulfill this congressional purpose of full-scale drug interdiction, the source must be attacked. Congress, therefore, attacked those engaged in international drug trafficking with all the authority it could muster. Its purpose was to close all loopholes available to those engaged in this illicit trade; and, a careful examination of the statutory scheme at issue indicates that none presently exist.

By making it necessary for the prosecution to prove that the defendant knew that the controlled substance was to enter the United States, what the majority opinion does is not merely to recognize a lacuna in the law, but to create an unnecessary obstacle to the enforcement of the drug laws. In certain cases involving the key players in drug conspiracies, prosecutors will be able to surmount this hurdle by successfully employing the majority's proposed conscious-avoidance charge. The beneficiaries of the majority's opinion, however, will be those individuals who are on the periphery of importation schemes. Couriers and the like will easily be able to create a reasonable doubt as to both their knowledge of the destination of a controlled substance and their conscious-avoidance of such knowledge. Lest there be any question, couriers and other peripheral participants, on the whole, play an essential role in the proliferation of drugs in this country. Their role in drug trafficking should never be underestimated.

In sum, I am unable to agree with the majority's reading of the statutory scheme in question because it is semantically unsound and is at cross-purposes with clear congressional efforts to enhance drug interdiction. Accordingly, I dissent.

