# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 16, 2006     Decided February 16, 2007

No. 06-3031

UNITED STATES OF AMERICA,
APPELLEE

v.

WILLIAM ELIU MARTINEZ,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00331-01)

*John C. Belcher* argued the cause and filed the briefs for appellant.

*Teresa A. Wallbaum*, Appellate Counsel, U.S. Department of Justice, argued the cause and filed the brief for appellee.

Before: GINSBURG, *Chief Judge*, and ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*:  On March 16, 1999, in Guatemala, U.S. Drug Enforcement Administration agents and Guatemalan officials intercepted a land shipment of cocaine from Colombia to the United States that was worth well over $10 million.  As a result of its investigation, the U.S. Government later arrested and brought criminal charges against William Eliu Martinez, a former government official from El Salvador, for his involvement in this cocaine shipment.  The grand jury indictment charged Martinez with distributing cocaine and conspiring to import cocaine into the United States. After a jury trial in the District of Columbia, Martinez was convicted and sentenced to 29 years in prison.  Martinez appeals his conviction; he challenges the admission of certain evidence at trial, the sufficiency of the evidence supporting his conviction, and the District Court's jury instructions. Martinez's arguments are without merit, and we affirm.

I

Because this is an appeal from a conviction, we recount the relevant facts in the light most favorable to the Government. From the fall of 1998 until at least the summer of 2000, William Martinez participated in a conspiracy to import cocaine from Colombia into the United States.  The co-conspirators shipped the cocaine via the Pacific Ocean from Colombia to El Salvador – and then transported the cocaine in trucks north from El Salvador through Guatemala and Mexico into the United States.

According to voluntary statements that Martinez provided to Drug Enforcement Administration agents upon his arrest, Martinez entered the cocaine conspiracy after contact with an individual named Chino whom Martinez met when Martinez lived in Houston, Texas, in the 1990s.  After Martinez moved back to El Salvador in 1998, Chino contacted Martinez about an opportunity for Martinez to participate in a business operation with several men from Guatemala – Otto Herrera, Guillermo Herrera, and Byron Linares – who were part of an enterprise referred to as the "Otto Herrera Drug Trafficking Organization." In the latter part of 1998, Martinez began participating in this drug conspiracy; Martinez was aware that the business involved international cocaine trafficking.

The evidence at trial demonstrated that Martinez supervised several key aspects of the operation – including receiving Colombian cocaine in El Salvador and helping to prepare the cocaine for transportation north.  In August 1998, for example, Martinez purchased vessels known as "go-fast" boats that traveled from the coast of El Salvador into the Pacific Ocean to receive the cocaine from large vessels coming from Colombia. In addition, Martinez rented several properties in El Salvador to store the boats and to temporarily stash the cocaine until the operation was ready to transport the cocaine north from El Salvador.  Martinez built high walls so that outsiders could not see onto the property.

Martinez took steps to prevent local authorities in Central America from discovering the operation.  For instance, Martinez attempted to ensure that vehicles transporting the cocaine within El Salvador would not be detained by the police.  On one occasion, Martinez used his congressional position to intervene when local law enforcement officers stopped a pick-up truck towing one of Martinez's boats.

Martinez recruited and paid individuals who on multiple occasions used his boats to transport cocaine. According to testimony of a man named Sabas and his father-in-law Revelo, who were lower-level workers in the operation, Martinez himself typically did not travel on the boats to obtain the cocaine, but he did help unload it at the rental properties. Martinez also oversaw the re-loading of the cocaine onto pick-up trucks; those trucks in turn transported the cocaine to another site where the cocaine was loaded onto larger trucks for north-bound international transportation. During the unloading of the cocaine from Martinez's boats, Martinez regularly stood by with a gun while supervising Sabas, Revelo, and others.

At trial, Sabas and Revelo (the two lower-level insiders) recounted Martinez's role with respect to the specific March 1999 cocaine shipment. While Martinez waited on land, Sabas and several others traveled out into the Pacific Ocean to meet a large vessel carrying the cocaine. Once Martinez's boats reached the larger vessel, individuals on that larger vessel tossed the large black bales of cocaine onto the smaller boats. The large bales each contained as many as 36 "bricks" of cocaine. When the boats returned to shore, Martinez was waiting and armed. Martinez helped remove the boats from the water and covered them with a tarp for temporary storage. Martinez also observed the re-loading of the cocaine onto pick-up trucks for transportation to the site where three larger trucks waited to transport the cocaine north. According to Sabas, Martinez told Sabas that the bales contained cocaine. Martinez also warned Sabas that Sabas and his family could be killed if Sabas told anyone about the cocaine operation.

On March 16, 1999, the DEA and Guatemalan National Police seized cocaine from the three large trucks transporting the cocaine just after the trucks crossed the border from El Salvador into Guatemala.

The DEA and Guatemalan police conducted the March 16, 1999, seizure based on information that DEA officers received from an informant named Lopez who was also involved with the Herrera Organization. Three days earlier, Lopez began providing information to the DEA about the Herrera Organization's transportation of cocaine from Colombia through Nicaragua, El Salvador, Guatemala, and Mexico, and ultimately to the United States. On March 16, Lopez informed the DEA that the cocaine shipment would occur later that day. Lopez indicated the trucks would be "traveling northbound on [the] intercontinental highway that was the transit to Guatemala" and "that traverses through the country of Guatemala towards Mexico." J.A. 594-95, 752 (Moren Testimony). During the course of his conversations with the DEA, Lopez also stated that the cocaine shipment was ultimately destined for the United States.

Lopez's information enabled the DEA and the Guatemalan National Police to seize the shipment just after the trucks crossed the border into Guatemala on the Pan-American Highway. The three trucks contained a total of 2,556 kilograms of cocaine. Each kilogram "brick" of cocaine was wrapped in brown packaging tape, and some "bricks" were labeled with logos, such as an American flag with an eagle or the words "Mobil Super Plus." (One of the Government's witnesses, former Agent Michael Garland, provided expert testimony that drug traffickers use such logos to help give delivery instructions to individuals distributing the cocaine.)

The day after the seizure, Lopez informed the DEA that several individuals involved with the conspiracy had expressed anger over the thwarted operation. Then on March 19, Lopez told the DEA about the conspirators' future plans to transport more cocaine up through Guatemala and Mexico. A few days later, Lopez was shot and killed in Guatemala City, Guatemala.

(Because of Lopez's unavailability at trial, Agent Daniel Moren, one of the officers who recruited Lopez, testified about the statements that Lopez provided to the DEA.)

The United States subsequently brought a two-count federal grand jury indictment against Martinez and arrested him in Central America. The counts in the indictment were: (1) "conspiracy to knowingly and intentionally import five kilograms or more of a mixture and substance containing a detectable amount of cocaine . . . into the United States," *see* 21 U.S.C. §§ 952(a), 960(a), and 963; and (2) "knowingly and intentionally manufacturing or distributing five kilograms or more of a mixture and substance containing a detectable amount of cocaine . . . intending . . . or knowing that such substance would be unlawfully imported into the United States," *see* 21 U.S.C. § 959(a). J.A. 222 (Verdict Form). Following a nine-day trial, a jury convicted Martinez of both counts.

II

On appeal, Martinez raises four main arguments. First, Martinez challenges the admission of the hearsay statements of Lopez, the deceased informant. Second, Martinez contests the admission of Garland's expert testimony that the United States is the typical destination for Colombian cocaine transported through Central America. Third, Martinez contends there was insufficient evidence for a reasonable jury to find that Martinez knew the destination of the cocaine shipment was the United States. And fourth, Martinez argues that the jury instructions were flawed.

A

Martinez contends that Lopez's statements do not satisfy the requirements of the Rule 804(b)(6) hearsay exception. He also argues that admission of the statements violated the Sixth Amendment's Confrontation Clause.

1. The District Court admitted Lopez's statements under the hearsay exception in Rule 804(b)(6). That Rule allows admission of hearsay statements made by an unavailable declarant if the statements are "offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

The District Court concluded by a "preponderance of the evidence" that the circumstances of Lopez's death satisfied the requirements of Rule 804(b)(6). *See United States v. Carson*, 455 F.3d 336, 362 (D.C. Cir. 2006). In particular, the District Court concluded that Martinez's co-conspirators murdered Lopez to procure his unavailability as a witness and Martinez was aware that his co-conspirators were willing to engage in murder to protect the conspiracy. *See United States v. Thompson*, 286 F.3d 950, 963-65 (7th Cir. 2002); *United States v. Cherry*, 217 F.3d 811, 820-21 (10th Cir. 2000).

Martinez suggests that the evidence does not support the conclusion that the Herrera Organization was responsible for Lopez's death. We review the District Court's contrary factual conclusion for clear error. *Carson*, 455 F.3d at 362. We agree with the District Court that Martinez's argument is unpersuasive.

To begin with, as the District Court explained, Martinez's earlier threat to Sabas and Sabas's family showed that Martinez and his co-conspirators considered murder to be "a possible

sanction to protect the privacy of the conspiracy." J.A. 636-38 (District Court determination of admissibility of Lopez's statements). In Lopez's case, that tactic was employed. Lopez was shot and killed within a few weeks of the seizure of 2,556 kilograms of cocaine that Martinez and the Herrera Organization conspired to import into the United States. That cocaine would have been worth well over $10 million if it had reached its final destination. And Lopez was the informant who helped law enforcement uncover the conspiracy.

Revelo was an insider, and he testified that he learned from a man named Pedro (who worked closely with Martinez and the Herrera Organization) that Lopez was killed by individuals associated with the March 16th shipment. Pedro stated that the shipment was "taken down" due to Lopez's communication with the police. J.A. 617-24 (Jorge Martinez Testimony), 638-41 (District Court admission of Pedro's statements under co-conspirator hearsay exception, Rule 801(d)(2)(E)).

To be sure, upon its initial investigation, the Guatemalan National Police apparently believed that Lopez's death might be tied to an altercation between Lopez and several individuals unrelated to the March 16th cocaine shipment, and the police arrested four individuals on that ground. But Agent Moren testified that he believed the Guatemalan police later released those four individuals. In any event, given Pedro's statements and Sabas's testimony, the District Court did not clearly err in determining that the Herrera Organization was in fact responsible for Lopez's death for purposes of Rule 804(b)(6).

Even assuming Lopez was killed by the Herrera Organization, Martinez argues that Lopez's murder was not "intended to" procure Lopez's unavailability as a witness. Instead, Martinez contends that the Herrera Organization would have murdered Lopez to retaliate for the loss of the March 16th

cocaine shipment. Martinez's argument is based on a false either-or dichotomy. It is surely reasonable to conclude that anyone who murders an informant does so intending *both* to exact revenge *and* to prevent the informant from disclosing further information and testifying. *See Carson*, 455 F.3d at 360-61 & n.21, 364 n.23. The two purposes often go hand-in-glove, and this case is just another good example. Martinez's argument would have the perverse consequence, moreover, of allowing criminals to murder informants and thereby prevent admission of the informants' statements – just so long as the criminal could show that the intent was retaliation (which the criminal almost always could do). The text of Rule 804(b)(6) does not support such an absurd and dangerous principle.

2. Controlling Supreme Court precedent forecloses Martinez's related contention that the admission of evidence under the "forfeiture by wrongdoing" hearsay exception could nonetheless violate the Confrontation Clause. A defendant forfeits the constitutional right to confront a witness "when, through his misconduct, he causes the witness to be unavailable." *Carson*, 455 F.3d at 361-63 & n.22; *see also Davis v. Washington*, 126 S. Ct. 2266, 2280 (2006) ("[O]ne who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."); *Crawford v. Washington*, 541 U.S. 36, 62 (2004) ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds . . . .").

B

Martinez raises three challenges to the District Court's admission under Federal Rule of Evidence 702 of former DEA Agent Garland's expert testimony. We review Martinez's challenges to Garland's testimony for abuse of discretion. *See United States v. Mejia*, 448 F.3d 436, 448 (D.C. Cir. 2006).

1.    Expert testimony about the methods of drug organizations is common in drug cases.  Here, Garland testified that the United States was the most likely destination of Colombian cocaine transported through Central America.

Martinez argues that Garland's expert testimony was duplicative of other testimony and therefore could not have assisted the trier of fact as required by Rule 702.  Rule 702 provides:    "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise . . . ."  Garland's expert testimony – that cocaine transported from Colombia through Central America is almost always headed to the United States – is entirely distinct from the factual statements by other witnesses that Martinez cites as duplicative.  Expert testimony about *general* trafficking routes does not duplicate factual testimony indicating that Martinez's *particular* conspiracy imported cocaine into the United States.

2.  Martinez next contends that the Government failed to provide a written pre-trial summary of the expert testimony. That argument is factually inaccurate.  Rule 16 of the Federal Rules of Criminal Procedure requires that "[a]t the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial."  In this case, the Government satisfied Rule 16 by indicating in writing approximately six weeks before trial that Garland would testify about the method of importing Colombian cocaine into the United States via Central America.  The Government provided that information in its Opposition to Defendant's Motion to Exclude Government's Expert Testimony and the affidavits by Garland submitted along with the Opposition.

3. Martinez also argues that Garland improperly provided opinion testimony regarding Martinez's specific knowledge that the cocaine was headed to the United States. Martinez relies on Rule of Evidence 704(b), which states: "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged . . . ." But the record makes clear that Garland did not testify about Martinez's particular mental state. Garland answered the "United States" in response to a question about where Colombian cocaine transported north was "generally" headed – not to a question about where Martinez thought the cocaine was headed. This Court recently held that very similar testimony (by the same expert witness Garland) about the methods of South and Central American drug trafficking operations did not include an improper opinion regarding the defendant's mental state under Rule 704(b); in that case, the District Court immediately clarified Garland's lack of personal knowledge of the defendant's mental state. *See Mejia*, 448 F.3d at 449 & n.9. Here, Garland stated during cross-examination that he had no personal knowledge of the Herrera Organization, thereby mitigating any risk that his statement would be misinterpreted. As in *Mejia*, "it is plain that Garland was testifying about drug organizations in general" – not about Martinez in particular. *Id.*

C

Martinez contends that there was insufficient evidence for a reasonable jury to conclude that he had knowledge or intent regarding the U.S. destination of the cocaine, as required under the distribution and conspiracy offenses with which Martinez was charged. We will not reverse a jury conviction on sufficiency grounds "unless, reviewing the evidence in the light most favorable to the Government, a reasonable jury could not

have found guilt beyond a reasonable doubt." *United States v. Chan Chun-Yin*, 958 F.2d 440, 443 (D.C. Cir. 1992) (internal quotation omitted); *see also United States v. Gomez*, 431 F.3d 818, 819 (D.C. Cir. 2005). In reviewing the evidence, we keep in mind that proof of Martinez's intent or knowledge "may take the form of circumstantial as well as direct evidence." *Chan Chun-Yin*, 958 F.2d at 443; *see also Mejia*, 448 F.3d at 451.

The evidence plainly establishes that Martinez knew he was involved in an international drug distribution conspiracy (with the Herrera Organization). The evidence also establishes that Martinez knew about the large and valuable March 1999 cocaine shipment and was deeply involved in supervising its transport. The evidence demonstrates that the Herrera Organization transported drugs to the United States. The evidence further shows that the March 1999 shipment was in fact headed to the United States when it was intercepted on the Pan-American Highway in Guatemala. Notwithstanding those facts, Martinez argues that a reasonable jury could not find that Martinez knew the United States was the destination of the cocaine that he helped to transport. In light of the above facts alone, that is obviously a very difficult argument for Martinez to maintain. Moreover, a plethora of additional circumstantial evidence further confirms a reasonable jury could find that Martinez had the requisite knowledge of the U.S. destination of cocaine.

• Martinez personally and closely supervised many key aspects of the international transportation of this massive shipment of cocaine. He owned the boats that acquired the Colombian cocaine from large ships in the Pacific Ocean and transported the cocaine back to El Salvador. He hired and paid the drivers of those boats and threatened one of those employees with death if he told the police about Martinez's operation. In addition, Martinez oversaw the unloading of the cocaine at properties in El Salvador, which Martinez had rented and

renovated to store the cocaine and hide it from public view. Martinez also supervised the re-loading of the cocaine onto pick-up trucks, which transported the cocaine to the trucks that drove the cocaine into Guatemala. Given Martinez's supervisory role, it strains credulity to suggest he did not know the United States was the ultimate destination.

- There is direct evidence that many of the lower-level individuals involved with the March 16th shipment of cocaine knew the cocaine was headed to the United States. For example, Lopez, who drove one of the three trucks transporting the cocaine seized on March 16 from the El Salvador-Guatemala border to a storage site within Guatemala, knew that the co-conspirators were transporting the cocaine to the United States. Lopez also informed the DEA that five other lower-level participants knew the shipment was going to the United States. If lower-level participants in the operation knew that the United States was the destination of the cocaine, it certainly stands to reason that a hands-on supervisor such as Martinez also knew as much.

- Martinez oversaw the unloading of the cocaine from his boats and the re-loading of the cocaine onto pick-up trucks for eventual international transportation. Martinez's role in the operation provided him with many opportunities to see the cocaine "bricks" – and at least one delivery logo used on the cocaine seized on March 16 was visibly related to the United States, as it included an American flag and eagle. (Garland testified about the practice of drug conspiracies transporting "bricks" of cocaine packaged with logos that communicate delivery instructions; and some of the cocaine seized on March 16 bore the same logos as cocaine later discovered in the United States.)

• Martinez had reason to know that the organization generally transported cocaine into the United States because Martinez learned of the conspiracy from Chino when both Martinez and Chino lived in the United States.

• Former DEA Agent Garland testified based on his extensive experience that almost every drug operation that transports Colombian cocaine by land through Central America intends to import the cocaine into the United States. Moreover, according to Garland, the Pan-American Highway is the typical route used by drug traffickers who transport drugs through Central America. That highway is the route the three trucks were traveling when law enforcement seized the Herrera Organization's cocaine in Guatemala on March 16, 1999. In general, only organizations intending to import cocaine into the United States would have reason to transport cocaine north via the Pan-American Highway. As Garland explained, those who transport Colombian cocaine from Colombia to overseas destinations, such as Europe or Australia, do not ordinarily first ship it by land through Central America because there is no logical reason to do so. Nor, Garland indicated, would Guatemala or Mexico be the likely destination of Colombian cocaine shipped north from El Salvador by land, because the sales price of cocaine (and thus the profits of the drug trafficking organization) increase dramatically when the drugs are sold in the United States. This expert testimony suggests that a sophisticated drug trafficker like Martinez would be well aware that drugs moving north on the Pan-American Highway – as this shipment was – were destined for the United States.

The evidence regarding Martinez's intent and knowledge about the U.S. destination of the cocaine was plenty sufficient for a reasonable jury to convict, especially when considered in light of decisions in this and other circuits examining the mens rea requirements of these statutes. *See, e.g.*, *Mejia*, 448 F.3d at

451-52, 459; *Chan Chun-Yin*, 958 F.2d at 443-44; *United States v. Bollinger*, 796 F.2d 1394, 1405 (11th Cir. 1986); *United States v. Bascaro*, 742 F.2d 1335, 1360 (11th Cir. 1984); *United States v. Conroy*, 589 F.2d 1258, 1269-71 (5th Cir. 1979).

Martinez relies heavily on *United States v. Londono-Villa*, 930 F.2d 994 (2d Cir. 1991). The Second Circuit in *Londono-Villa* overturned a jury verdict based on insufficient evidence of the defendant's intent regarding the U.S. importation of cocaine. 930 F.2d at 1001. Three aspects of *Londono-Villa*, however, make that case quite different from this one. First, the defendant in *Londono-Villa* had a much smaller role in the operation that imported cocaine to the United States than the multi-faceted supervisory role Martinez played in this conspiracy – meaning there was less basis to conclude that the defendant in *Londono-Villa* necessarily would have known of the conspiracy's basic methods and objectives. *See id.* at 995-96. Unlike Martinez's supervisory role, the defendant in *Londono-Villa* flew from Panama to Colombia simply to guide the pilot to a particular Colombian airstrip, and he worked for a different organization than the conspirators who trafficked the cocaine. *See id.*

Second, the defendant in *Londono-Villa* became involved only at the end of the cocaine operation. *Id.* at 1001. By contrast, Martinez helped to lay the groundwork for significant portions of international cocaine shipments – acquiring boats, hiring employees, and renting and renovating properties to help store the cocaine. Therefore, it was entirely reasonable for the jury in Martinez's case to conclude that his participation in many phases of the cocaine operation showed his knowledge that the ultimate objective of the operation was to import cocaine into the United States.

Third, unlike Martinez's awareness of his cocaine's transportation from Colombia through Central America, the

*Londono-Villa* defendant's awareness that the conspiracy transported drugs from Colombia to Panama would not necessarily have informed the defendant that the cocaine was headed to the United States. That is because Panama (which is contiguous with Colombia) is apparently sometimes used as an intermediate shipping point for drugs imported into countries other than the United States. *See id.* at 996. By contrast, in this case, the evidence showed that the "likelihood is extremely remote" that any Colombian cocaine transported north-bound along the highways of El Salvador and Guatemala would be destined for a location other than the United States. J.A. 818-21 (Garland Testimony).

Martinez also cites *United States v. Samad*, 754 F.2d 1091 (4th Cir. 1984). That case has no relevance here. Because the defendants in *Samad* were in the United States when they illegally received heroin, the evidentiary issue concerned whether the defendants knowingly received drugs – not whether defendants who knowingly transported drugs also knew the drugs' ultimate destination. *See id.* at 1096-99.

D

Martinez challenges the District Court's instructions to the jury. Because Martinez failed to object at trial to the jury instructions, we review these arguments for plain error. *See* Fed. R. Crim. P. 52(b).

1. Martinez contends that the jury instructions regarding the distribution charge against Martinez were "improper and confusing" because the District Court one time referred to the offense as "distribution of a controlled substance" rather than "distribution of a controlled substance knowing or intending that it would be imported into the United States." Appellant's Br. at 58-60 (internal quotations omitted). According to Martinez, the

characterization of a crime of "distribution" was especially problematic because the requirement of U.S. importation is the aspect of Martinez's distribution conviction that Martinez is challenging.

To begin with, the District Court's one-time identification of the offense as "distribution of a controlled substance" was accurate because that description merely restated the title of the offense as it appears in Section 959 of Title 21 of the U.S. Code. Moreover, the district judge repeatedly told the jurors the charge of distributing cocaine required that Martinez know or intend that the cocaine would be imported into the United States. Indeed, on no less than six occasions, the District Court characterized the distribution offense as a crime involving knowledge or intent regarding U.S. importation.

The district judge's repeated instructions that a distribution conviction requires proof of knowledge or intent regarding U.S. importation clearly sufficed to inform the jury of the elements of the offense. *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993).

2. Martinez next argues that the District Court failed to adequately respond to a jury note asking whether the conspiracy count required proof that Martinez knew about every unlawful objective of his co-conspirators, including the U.S. importation of the cocaine. In particular, the jury note asked the District Court to clarify an apparent inconsistency between the verdict form and the jury instructions received prior to jury deliberations. The verdict form indicated that conviction required knowledge or intent regarding U.S. importation, but the jury instructions at one point stated: "Furthermore, a defendant need not have been informed of the full scope of the conspiracy, nor need he be shown to have joined in all of the conspiracy's unlawful objectives in order for you to infer that he joined the

conspiracy knowingly." J.A. 937 (Jury Instructions). In response to the note, the District Court clarified that conviction of the conspiracy charge required proof of Martinez's knowledge or intent regarding U.S. importation. The District Court also directed the jury to an earlier page of the jury instructions, which described the knowledge or intent requirement for Martinez's conviction.

Martinez contends that the District Court's response was inadequate because it merely referred jurors back to the portion of the instructions that had confused them. But the District Court did not refer the jury back to the instructions about conspiracy that prompted the jury question; instead the judge referred the jury (correctly) to an entirely different segment of the instructions regarding the intent and knowledge requirement. In other words, the District Court resolved the question in a way *favorable* to Martinez. That is no doubt why Martinez's trial counsel did not object to the District Court's response to the question from the jury.

\* \* \*

The judgment of conviction is affirmed.

*So ordered.*