# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 14, 2015        Decided June 24, 2016

No. 10-3083

UNITED STATES OF AMERICA,
APPELLEE

v.

JUAN JOSE MARTINEZ VEGA,
ERMINSO CUEVAS CABRERA,
APPELLANTS

———

Consolidated with 10-3084

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:04-cr-00446-51)
(No. 1:04-cr-00446-49)

———

*Richard K. Gilbert*, appointed by the court, argued the cause for appellant Martinez Vega. *Manuel J. Retureta* and *Gary M. Sidell*, appointed by the court, argued the cause for appellant Cuevas. With them on the briefs was *Kristen Grim Hughes*.

*Michael A. Levy*, Assistant U.S. Attorney, argued the cause for appellee. On the brief were *Ronald C. Machen Jr.*, U.S. Attorney at the time the brief was filed, and *Randall W.*

*Jackson* and *Brian A. Jacobs*, Assistant U.S. Attorneys. *Elizabeth Trosman*, Assistant U.S. Attorney, entered an appearance.

Before: BROWN and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

PER CURIAM: Juan Jose Martinez Vega and Erminso Cuevas Cabrera were indicted with more than 50 other individuals for conspiring to commit crimes associated with the importation, manufacture, and distribution of cocaine into the United States. To date, only Martinez Vega, Cuevas, and one other have stood trial. *See United States v. Garcia*, 757 F.3d 315 (D.C. Cir. 2014).

The indicted individuals were allegedly affiliated with the Fuerzas Armadas Revolucionarias de Colombia ("FARC"), a "left-wing guerilla group that has waged a violent insurgency against Colombia's government for much of the last fifty years." *Id.* at 316. Though it initially eschewed the drug trade as counterrevolutionary, the FARC embraced the manufacture and exportation of cocaine in the early 1980s as a lucrative means to fund its increasingly ambitious military objectives. John Otis, *The FARC and Colombia's Illegal Drug Trade*, WILSON CENTER (Nov. 2014), at 3, https://www.wilsoncenter.org/sites/default/files/ Otis_FARCDrugTrade2014.pdf. By the 1990s and early 2000s, after the breakup of the famous Medellín and Cali cartels, the FARC began to consolidate its control over the coca fields and cocaine production. *Id.* at 4.

Martinez Vega and Cuevas allegedly occupied different roles within the cocaine trade. Martinez Vega's role primarily consisted of exporting cocaine and importing arms. Throughout his association with the FARC, he was allegedly

responsible for exporting at least 11,000 kilograms of cocaine and with supplying the FARC with 250 tons of ammunition, explosives, and weapons. Cuevas, on the other hand, allegedly operated a large cocaine laboratory that produced thousands of kilograms of cocaine paste each week. In addition to supervising that operation, Cuevas allegedly met with FARC officials on several occasions to oversee the shipment of coca base to his laboratory.

After their capture and extradition to the United States, Martinez Vega and Cuevas were tried for and convicted of violating Title 21 of the United States Code, Sections 812, 952, 959, 960, and 963. Taken together, these sections provide for the punishment of any person who knowingly or intentionally conspires to import, manufacture, or distribute five kilograms or more of cocaine into the United States. The district court then sentenced Martinez Vega and Cuevas to 330 and 348 months' imprisonment, respectively. These defendants come before us now appealing their convictions and sentences.

Three categories of issues are raised in this appeal: the joint issues, the Martinez Vega-specific issues, and the Cuevas-specific issues. Both Martinez Vega and Cuevas challenge the sufficiency of the evidence, the *mens rea* jury instructions, and the district court's denial of their motions alleging prosecutorial misconduct. Martinez Vega challenges several evidentiary rulings pertaining to identification evidence, as well as the application of a "managerial" sentencing enhancement. Finally, Cuevas challenges the admission of certain evidence, the adequacy of the district court's curative instruction to the jury regarding stricken testimony, the district court's refusal to permit cross-examination about witnesses wearing ankle monitoring devices, and its application of certain sentencing

enhancements. Detailed discussions of the facts, evidence, and standards of review will be set forth as necessary to address each issue Defendants raise.

## I. Joint Issues

Martinez Vega and Cuevas together raise three arguments for vacating their convictions: (i) the *mens rea* evidence was insufficient; (ii) the *mens rea* jury instructions were misleading; and (iii) the Government committed prejudicial prosecutorial misconduct. We address each in turn.

## A. Sufficiency of Evidence

Defendants argue the evidence at trial was insufficient to prove the *mens rea* element of their charged offense; that they *knew* or *intended* the cocaine would end up in the United States. *See* 21 U.S.C. § 952(a); *id.* § 959(a); *id.* § 960(a)(1), (a)(3). In their view, not only did the Government fail to put on any direct evidence of *mens rea*, the proffered circumstantial evidence doesn't justify the inference that either of them knew the destination of the cocaine.

Challenging a jury verdict for insufficient evidence carries with it an "exceedingly heavy burden." *United States v. Booker*, 436 F.3d 238, 241 (D.C. Cir. 2006); *see also United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009) (describing the burden as a "nearly insurmountable hurdle"). To prevail, Defendants must convince the court that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Stadd*, 636 F.3d 630, 636 (D.C. Cir. 2011). We review sufficiency-of-the-evidence claims "in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the

5

right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Dykes*, 406 F.3d 717, 721 (D.C. Cir. 2005).

We conclude the jury's *mens rea* determinations were justified by sufficient evidence. The Government demonstrated several facts from which a rational juror could reasonably infer intent or knowledge that the cocaine would end up in the United States. First, it demonstrated that at least half of the cocaine produced in Colombia is exported to the United States, establishing a substantial probability that at least some of the 11,000 kilograms of cocaine Martinez Vega trafficked or the thousands of kilograms of cocaine paste Cuevas manufactured each week was headed to the United States. Second, several witnesses confirmed that, among the FARC rank-and-file, it was a widespread and generally known fact that the cocaine they handled was destined for the United States. Maria Santiago and Hernan Santiago each testified that the destination of these drugs (the United States) was a topic of discussion among Cuevas's subordinates at the laboratory. And Alexis Perez offered similar testimony with respect to Martinez Vega, that it was "something normal to hear the comments that the coke was coming to the United States because it was said that it is the country that most consumes it." These testimonies justify an inference that those within both Martinez Vega's and Cuevas's operations were generally aware of the intended destination. Third, Martinez Vega and Cuevas had high-level roles in their association with the FARC, which, in conjunction with the previous point, justifies an inference that, given their rank within the organization, they were even more likely to know the destination than their subordinates. Martinez Vega was a leader within the 16th Front of the FARC—he was an important enough leader that the FARC provided security as he conducted his operations. Cuevas was the "general

administrator" of a large cocaine laboratory where he supervised about 80 workers and met with FARC officials to coordinate product deliveries.

These data points justify the jury's inferences that both Martinez Vega and Cuevas knew or intended the drugs would end up in the United States. This is not a close question. In fact, in *United States v. Martinez*, this court upheld a conviction for conspiracy to import cocaine into the United States against an insufficiency challenge based on evidence that closely mirrors the evidence in this case. 476 F.3d 961, 963 (D.C. Cir. 2007). First, a former DEA Agent testified, based on his extensive experience, that "almost every drug operation that transports Colombian cocaine by land through Central America intends to import the cocaine into the United States." *Id.* at 969. Second, there was direct evidence that "many of the lower-level individuals involved with the . . . shipment of cocaine knew [it] was headed to the United States." *Id.* And third, Martinez "supervised many key aspects of the international transportation of this massive shipment of cocaine." *Id.* at 968.

In response, Defendants stress a lack of *direct* evidence of knowledge or intent, but that emphasis is unavailing. Our review of insufficiency claims treats all evidence—direct or circumstantial—the same. *See Dykes*, 406 F.3d at 721. Moreover, this argument carries even less weight considering their insufficiency claim alleges a lack of direct *mens rea* evidence. In "most cases in which the defendant's state of mind is at issue, it may be near impossible to establish the requisite *mens rea* through direct evidence," and therefore proof must be inferred from circumstantial evidence instead. *United States v. Schaffer*, 183 F.3d 833, 843 (D.C. Cir. 1999). As we have shown, the proffered circumstantial evidence is

sufficient to support the jury's guilty verdicts, and accordingly, we reject Defendants' insufficiency claim.

## B. Jury Instructions

Martinez Vega and Cuevas also challenge the district court's jury instructions. Specifically, they claim the instructions failed to adequately convey that Defendants "personally intended the cocaine be imported into the United States or personally knew the cocaine would be imported into the United States." Defendants Br. 41. Defendants' argument focuses on the district court's use of a "shorthand" description of the *mens rea* requirement. In their view, the instructions were "highly ambiguous" and "widen[ed] the meaning of conspiracy" by "minimiz[ing] a defendant's necessary involvement." *Id.* at 43.

When reviewing a challenge to jury instructions, "[t]he pertinent question is whether, taken as a whole, the instructions accurately state the governing law and provide the jury with sufficient understanding of those issues and applicable standards." *United States v. Wilson*, 605 F.3d 985, 1018 (D.C. Cir. 2010). While the propriety of a submitted jury instruction is reviewed *de novo*, "the choice of language to be used in a particular instruction . . . is reviewed only for abuse of discretion." *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 556 (D.C. Cir. 1993).

The district court's instructions began with a recitation of the charge, which included an accurate description of the "knowing or intending" *mens rea* requirement. Then, the court broke the Government's burden into two parts. First, the Government was required to demonstrate an "agreement to import . . . or to manufacture and distribute five kilograms or more of cocaine knowing and intending that it would be

imported into the United States." Second, the Government was required to demonstrate that Martinez Vega and Cuevas "intentionally joined in that agreement." Explaining further, the district court stated the Government must prove "a defendant participated in the conspiracy with knowledge of its unlawful purposes, and with an intent to aid in the accomplishment of its unlawful objectives." Following this robust description of the Government's burden, the district court concluded with a concise and accurate summary of the *mens rea* requirement:

> Thus with respect to count one, if you find beyond a reasonable doubt that the defendant conspired to import any amount of cocaine into the United States, or to manufacture any amount of cocaine with the intent or knowledge that it would later be imported to the United States, then you should find the defendant guilty. If, however, you find that the government has not proven beyond a reasonable doubt that the defendant conspired to import any amount of cocaine into the United States or to manufacture and distribute any amount of cocaine with the intent or knowledge that it would later be imported to the United States, then you should [find] the defendant not guilty.

On multiple occasions throughout the instructions, the district court accurately and clearly explained the *mens rea* requirement. And as we have stated, "[j]ury instructions are proper if, when viewed as a whole, they fairly present the applicable legal principles and standards." *Czekalski v. LaHood*, 589 F.3d 449, 453 (D.C. Cir. 2009).

Defendants' concern centers on the district court's shorthand description of the *mens rea* requirement, "that a

defendant participated in the conspiracy with knowledge of its *unlawful purposes*, and with an intent to aid in the accomplishment of its *unlawful objectives*." This instruction, however, was immediately preceded by a description of what the conspiracy's unlawful purposes and unlawful objectives were—the importation, manufacture, and distribution of cocaine with knowledge or intent that it end up in the United States. That *mens rea* language is cumbersome, and the district court's decision to use a shorthand method of referring to it did not render the *mens rea* instruction ambiguous, especially considering that this shorthand language is bookended by two unmistakably clear and entirely accurate descriptions of the requirement. Jury instructions "must be evaluated not in isolation but in the context of the entire charge." *Jones v. United States*, 527 U.S. 373, 391 (1999). Taken as a whole, these instructions clearly informed the jurors of the precise nature of the *mens rea* question before them. Because the *mens rea* jury instructions unambiguously and accurately reflected the state of the law, we hold the district court did not err.

## C.  Prosecutorial Misconduct

Defendants allege the prosecutor improperly (i) appealed to the jury to act as the "community conscience"; (ii) expressed personal opinion regarding Defendants' guilt; and (iii) discussed the court's overruling of a defense objection during closing arguments. Each of these prosecutorial misconduct claims fail. We address each in turn.

First, Defendants contend the prosecutor's references to America's drug culture and related problems in its closing summation were unfairly "designed to inflame the passions or prejudices" of jurors. Defendants Br. 47 (quoting *United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000)).

Specifically, the prosecutor told the jury that "a lot of the problems here in Washington D.C., in New York, in Detroit where I grew up, can be traced right back to [drug trafficking]." In Defendants' view, the prosecutor perceived the jury "might be [un]interested in Colombia's drug problems," Defendants Br. 48, which led him to improperly tie the Colombian drug trade to the American drug problem, inviting the jury to act as the "community conscience."

To be sure, a suggestion that the jury act as the "community conscience" can constitute error. In *United States v. Hawkins*, our circuit warned it is improper to "substitute emotion for evidence by equating, directly or by innuendo, a verdict of guilty to a blow against the drug problem." 595 F.2d 751, 754 (D.C. Cir. 1978); *see also United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991) (holding an appeal to the jury to act as the community conscience is improper when it is "calculated to incite the passions and prejudices of the jurors"). This caution derives from *Viereck v. United States*, 318 U.S. 236 (1943), in which the Supreme Court held a prosecutor's appeal to jurors' patriotism during World War II was "wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice." *Id.* at 247.

But, critical to our disposition here, the *Hawkins* panel held that such erroneous appeals may not warrant reversal "in light of the relative strength of the case against the accused." 595 F.2d at 754. Because "[t]he Government's case against appellant was strong indeed," and the "instructions given by the trial court sufficiently diluted any prejudice," the panel held it was not "an occasion on which reversal would be appropriate." *Id.* at 755; *see also United States v. Barnett*, No. 97-3091, 1998 WL 203122, at *1 (D.C. Cir. April 8,

1998) (per curiam) ("[A]ppealing to the jury to 'do the right thing' is not clearly erroneous when, as here, the Government couples its argument that the jury should 'do the right thing' with specific references to the evidence in the record. . . . Furthermore, the evidence presented at trial was sufficiently probative of Barnett's guilt that any error that might have occurred was not prejudicial.").

As it was in *Hawkins*, so it is here. Even if the prosecutor erred in connecting Martinez Vega's and Cuevas's charges to America's drug problems, the error was harmless because the case against the Defendants was "strong indeed." *Hawkins*, 595 F.2d at 755. In light of that strong case, and also given the district court's instruction that "the statements and the arguments of the lawyers are not evidence," the prosecutor's appeal to the jury to act as the "community conscience" does not warrant reversal.

Second, Defendants contend the prosecutor improperly interjected personal beliefs into his closing statement. "When a prosecutor gives his personal opinion on the credibility of witnesses or the defendant's guilt . . . 'such comments can . . . jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury.'" *United States v. Hampton*, 718 F.3d 978, 983 (D.C. Cir. 2013) (quoting *United States v. Young*, 470 U.S. 1, 18 (1985)). At various points throughout the prosecutor's summation, he spoke in the "first person singular," making such statements as, "I think the evidence did prove that . . ."; "I think it is clear . . ."; "But if you consider the recordings, and I think you should, it becomes obvious . . ."; "I don't know if I buy that . . ."; "I'm not sure I buy it. I don't think you should either . . ."; and "I'm not even sure what to make of this argument." Defendants argue these statements violate the Supreme

Court's injunction against prosecutors "interjecting personal beliefs." *See Young*, 470 U.S. at 7–8.

Two of our sister circuits have directly confronted the question whether speaking in the first person singular is a ground for a new trial. *See United States v. Nersesian*, 824 F.2d 1294, 1328–29 (2d Cir. 1987); *United States v. Carleo*, 576 F.2d 846, 851–52 (10th Cir. 1978). Reviewing similar statements as found here, the *Nersesian* court "stress[ed] that it is a poor practice, one which this court has repeatedly admonished prosecutors to avoid." 824 F.2d at 1328. That said, and despite recognizing "[i]t is well settled that it is improper for a prosecutor to interject personal beliefs into a summation," the court nonetheless declined to reverse. *Id.* Viewing the summation "as a whole," the Second Circuit examined whether the improper language "amount[ed] to unacceptable vouching." *Id.* Several considerations prompted the court to conclude it did not. For one, the "offending conduct was . . . limited to a relatively small portion of an overall lengthy summation." *Id.* Moreover, the district court "instruct[ed] the jury that the lawyer's statements were not evidence," and defense counsel made no "contemporaneous objections." *Id.* Also, the court concluded "it can fairly be said that appellants' convictions were the result of the jury's assessment of the evidence, not the result of improper argument by the prosecutor." *Id.*; *see also United States v. Restrepo*, 547 F. App'x 34, 42 (2d Cir. 2013) (warning prosecutors to avoid first-person formulations but ultimately concluding "there [was] no likelihood that the jury was misled about the argument the prosecutor was making"); *but see United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir. 1996) (concluding "not all uses of the pronoun 'I' are improper" such as "I suggest that," which "shie[s] away from an outright endorsement"). In *Carleo*, the Tenth Circuit charted a similar path. 576 F.2d at 851–52. Deeming

improper the prosecutor's first person formulation, the court nonetheless determined the prosecutor "was neither personally vouching for the credibility of the government witness nor personally attacking the credibility of the defendant," nor was he "attempting to convey to the jury that he somehow possessed information . . . to which the jury was not privy." *Id.* at 852. In light of these conclusions, the court held the trial court did not abuse its discretion in denying a motion for a new trial. *See id.*

We join our sister circuits in admonishing prosecutors to avoid the "use of the personal pronoun 'I.'" *Nersesian*, 824 F.2d at 1328. It is poor practice and threatens the defendant's right to a fair trial. But as in *Nersesian*, *Restrepo*, and *Carleo*, the prosecutor's remarks here do not constitute reversible error. As noted above, the district court instructed the jury that the "statements and the arguments of the lawyers are not evidence," and the few offending statements were contained within a very lengthy closing summation of the Government's strong case. While the prosecutor should have avoided the personal pronoun, had he replaced "I" with slightly different phrases like "the evidence shows" or "the record is clear that," he could have communicated a nearly identical sentiment without any impropriety.[1] *Cf. United States v. Eltayib*, 88 F.3d 157, 172 (2d Cir. 1996) ("The problem with

---

[1] In other words, slight stylistic cures can head off objections like this at the pass. It is important to the integrity of the jury trial process to avoid vouching or interjecting personal beliefs, but there are plenty of proper ways to communicate what the prosecutor attempted to say here. For example, compare the following phrases. The prosecutor said: "I think the evidence did prove that . . . ." An error-free way to say the same thing: "The evidence proves . . . ." The prosecutor said, "I don't know if I buy that . . .", but he could have said, "What you heard at trial casts doubt on that . . . ."

a prosecutor's use of the pronoun 'I' is that it 'tends to make an issue of [the prosecutor's] own credibility, or to imply the existence of extraneous proof."). Moreover, Defendants' counsel also failed to object to these statements at trial, so our appellate touch is even lighter here than it otherwise might have been. *See United States v. Olano*, 507 U.S. 725, 732 (1993). Accordingly, we conclude the jury's guilty verdict was a product of the Government's strong case against Martinez Vega and Cuevas, not the prosecutors stray improper remarks.

Third, Defendants argue that a PowerPoint slide containing a reference to an overruled defense objection constituted prosecutorial misconduct. Even assuming the reference was error, Defendants fail to present any theory whatsoever as to why it prejudiced them. Even their reply brief contains no explanation, despite the Government's argument pointing out this critical defect. Reply Br. at 24. (The entire response: "The Government offers no theory to support presentation of a PowerPoint slide depicting the overruling of a defense objection to the jury. Defendants submit that none exists, especially in light of the district court's midtrial instruction."). Without a showing of "substantial prejudice," an act of prosecutorial misconduct cannot constitute reversible error. *See United States v. Small*, 74 F.3d 1276, 1280 (D.C. Cir. 1996). Defendants' failure to show any prejudice, let alone substantial prejudice, is fatal to their prosecutorial misconduct claim.

## II. Issues Raised by Martinez Vega

Martinez Vega individually challenges several of the district court's rulings pertaining to evidence identifying his involvement in criminal activities. According to Martinez Vega, such evidence was crucial to his eventual conviction

because the Government's case against him relied primarily on accepting both that a person nicknamed "Chiguiro" was a significant member of the FARC's 16th Front operation, and that Martinez Vega was that individual.[2]   Specifically, Martinez Vega argues that the district court committed reversible error in failing (i) to compel the Government to correct the false testimony of DEA Intelligence Research Specialist Francisco Garrido; (ii) to give "missing-evidence" instructions to the jury regarding photo arrays that had been used with certain witnesses; (iii) to sanction the Government for its failure to timely disclose a photograph identifying another man as "Chiguiro"; and (iv) to admit a prior inconsistent statement by government witness Ignacio Gonzales Jaramillo.  Martinez Vega also appeals the district court's application of a "managerial role" sentencing enhancement.  We reject all of the evidentiary claims, but vacate and remand Martinez Vega's sentence to the district court for further consideration.

## A.  Failure to Correct False Testimony

Former FARC member and prosecution witness Viviana Ortiz testified on cross-examination that, during an interview at the U.S. Embassy in Bogotá, she was shown some photographs, one of which she identified as Martinez Vega by the nickname "Chiguiro."  Defense counsel objected that the prosecution had not previously disclosed Ortiz's photographic identification of Martinez Vega.  The prosecutor disclaimed any prior knowledge of the identification, and the district court instructed the Government to "check with your records and your agents to see if . . . somebody showed her a photo, if you have a record of it."  S.A. 189–90.  The following

---

[2] "Chiguiro" is another name for a capybara, "an extremely large, semi-aquatic rodent, indigenous to South America."  Gov't Br. 4.

morning, the prosecutor reported to the court his "suspicion" that Ortiz had been shown photographs by an agent of the Drug Enforcement Agency, but the Government "[didn't] have a record of that." *Id.* at 212.

During the defense case, Martinez Vega called Francisco Garrido, a DEA Intelligence Research Specialist, and questioned him about his interviews in Bogotá of former FARC members, including Ortiz. On re-direct, defense counsel confirmed with Garrido that Ortiz had identified Martinez Vega as "Chiguiro." When asked, "But you did not actually show her photographs of Chiguiro, did you?" Garrido responded, "I believe I did. I had a copy of the photo array depicting your client." S.A. 539.

Martinez Vega's counsel objected that Garrido's testimony was inconsistent with the Government's prior representation that "they did not have anybody who could confirm or deny whether Ms. Ort[i]z was shown some identifications [*sic*]." S.A. 539–40. The Government denied any inconsistency, differentiating between a lack of *records* about the identification and Garrido's own *recollection* of the events. The court stated that Martinez Vega could ask additional questions if he wished to probe Garrido's memory.

During continued questioning by defense counsel, Garrido confirmed that he had shown Ortiz a photo array and claimed that the photographs "became part of the case folder." S.A. 544–46. At sidebar, defense counsel asked for the photographs shown to Ortiz. The Government responded that Garrido appeared to be testifying to "his belief," but that "there was only one photo array that was ever created" including Martinez Vega's picture, and Garrido likely "does not have any photo array that is marked by Vivian[a] Ort[i]z,

or that he recorded as being a specific one that she identified." *Id.* at 548.[3]

In a subsequent hearing outside the presence of the jury, the district court allowed both sides to continue questioning Garrido about the issue. Garrido confirmed that he created only one photo array relating to Martinez Vega, but denied any knowledge as to whether anyone had Ortiz "mark a photo array." S.A. 552. He testified that he did not record or make any notes of Ortiz specifically marking or identifying any photograph in the array. Garrido also admitted that he had "no independent recollection" of whether or not Ortiz was actually shown a photo array; his belief was based on the fact that he had shown the photo array to "numerous people" during the investigation. *Id.* at 553.

The next day, Martinez Vega moved to dismiss the case due to the Government's failure to correct Garrido's testimony before the jury. The court denied the motion from the bench, finding that the Government was not "deliberately withholding information that's false or allowing false testimony to go forward uncorrected." J.A. 1675. Martinez Vega raised the issue again in his motion for a new trial. The court once more denied the request, reasoning that, even if Garrido had testified falsely about having shown Ortiz a photo array, such testimony was immaterial and could not have affected the jury's judgment because there was sufficient other evidence at trial regarding Martinez Vega's identity.

A claim that the Government violated the Fifth Amendment by knowingly failing to correct false testimony is reviewed *de novo*. *See United States v. Mejia*, 597 F.3d 1329, 1338 (D.C. Cir. 2010). The district court's denials of motions for a mistrial and for a new trial are reviewed for abuse of

---

[3] The "one" acknowledged photo array was previously admitted.

discretion. *See United States v. Moore*, 651 F.3d 30, 50 (D.C. Cir. 2011) (mistrial); *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010) (new trial).

Under *Napue v. Illinois*, 360 U.S. 264 (1959), the Government "may not knowingly use false evidence" or "allow[] it to go uncorrected when it appears," *id.* at 269. "This rule applies both when the testimony relates directly to an essential element of the government's proof and when it affects the credibility of a crucial witness." *United States v. Iverson*, 637 F.2d 799, 801 (D.C. Cir. 1980), *modified*, 648 F.2d 737 (D.C. Cir. 1981). "The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue*, 360 U.S. at 269.

Yet even if the prosecution either sponsored or failed to correct false testimony, the grant of a new trial is not automatic. *See United States v. Burch*, 156 F.3d 1315, 1329 (D.C. Cir. 1998); *Giglio v. United States*, 405 U.S. 150, 154 (1972). Rather, "a reviewing court must determine whether 'the false testimony could in any reasonable likelihood have affected the judgment of the jury.'" *Burch*, 156 F.3d at 1329 (quoting *Giglio*, 405 U.S. at 154). Put another way, "the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt." *United States v. Bagley*, 473 U.S. 667, 680 (1985).[4]

As a preliminary matter, the Government's effort to portray Garrido's testimony as merely an "equivocal"

---

[4] This standard is equivalent to the harmless-error standard for constitutional error under *Chapman v. California*, 386 U.S. 18 (1978). *See Bagley*, 473 U.S. at 679 n.9.

expression of his "belief" that he had shown Ortiz photographs of "Chiguiro" (Gov't Br. 48–49) strains credulity and is heavily dependent on selectively parsing and rearranging Garrido's actual words. While Garrido did initially say he "believe[d]" he had shown "photographs of Chiguiro" to Ortiz, S.A. 539, he then proceeded to describe a specific photo array, whether it included certain individuals, and what he did with the array afterwards. Similarly, when read in context, Garrido's affirmative response to the question whether he had shown Ortiz "any photographs" was not an answer to a "broad and general question" about any random assortment of pictures as the Government suggests. Gov't Br. 49. Since Garrido had just testified about a photo array depicting Martinez Vega and Ortiz's identification of Martinez Vega as "Chiguiro," both defense counsel's question ("Now let me then ask you about the identification *you told us about*. . . . When you met Ms. Ort[i]z on November 19, 2008, did you show her any photographs?" S.A. 544–45) (emphasis added), and Garrido's answer ("Yes." *Id.* at 545), by their plain terms referred to the specific photographs in the aforementioned photo array.[5]

Disappointingly, the Government knew or should have known that this testimony was suspect. The Government had

---

[5] Moreover, the Government is wrong to assert that the district court found that Garrido did not testify falsely about his use of the photo array. To the contrary, the district court acknowledged the "legitimate" questions regarding the credibility of Garrido's testimony, but ruled that the Government's conduct did not warrant dismissal in light of the "multiple identifications of Mr. Martinez Vega by other individuals" at trial. S.A. 922–23. Later, in ruling on Martinez Vega's motion for a new trial, the court expressly declined to make any determination as to whether Garrido's testimony was false, finding that it was not material even if false.

previously disclaimed any prior knowledge of a photo-array identification by Ortiz and reported to the court that it had no record of anyone showing Ortiz photographs. The Government thus should have been on full alert as soon as Garrido started testifying to a different story. The hearing conducted by the district court, outside of the jury's presence, spotlighted Garrido's inaccuracies.[6] Hair-splitting distinctions in degree of falsity and inaccuracy should not be the currency of federal prosecutors. *See Napue*, 360 U.S. at 269 ("[A]lthough not soliciting false evidence," the government is bound to correct it "when it appears.").

The only thing that saves the Government is that Garrido's testimony could not "in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S. at 271. Martinez Vega argues that permitting Garrido's testimony to remain uncorrected not only bolstered the substantive testimony of Ortiz, but also reinforced the overall credibility of both witnesses. That is, a revelation that Garrido's testimony was false might have cast doubt on the general reliability of both Ortiz and Garrido, particularly given other inconsistencies in their testimonies. And that in turn might have colored the jury's acceptance or rejection of Garrido's and Ortiz's testimony on other matters.

---

[6] *See* S.A. 553 (Q: "So, when you testified that you believed that the photo array . . . that you believed was shown to Ms. Ortiz was in the case file, can you explain what you were talking about?" A: "I thought that the photo array—that she was shown a photo array and that she had markings, but she didn't [*sic*]." Q: "Well, can you . . . state with certainty that Ms. Ortiz was actually shown a photo array?" A: "I don't have an independent recollection whether she was or wasn't. I really don't remember."); *id.* at 555 (Q: "So, as you sit here today, did you or did you not show Viviana Ortiz a photo array?" A: "As I sit here today, I don't have a recollection whether I did or I did not.").

That line of reasoning does not hold up given the record in this case. First, Ortiz's identification of Martinez Vega during the alleged photo array presentation was of dubious relevance, given that Ortiz had repeatedly identified Martinez Vega and connected him to the nickname "Chiguiro" earlier in the trial. Indeed, she identified him by that moniker at the very start of her testimony, and again while being shown video footage of guerillas crossing a river "with Chiguiro." Importantly, Ortiz based those in-court identifications on her frequent, personal, and direct observations of Martinez Vega working with the FARC. She recounted, for example, providing security for Martinez Vega while he and his men transported weapons and cocaine base. She also testified to seeing him speak with various FARC commanders and move drugs and weapons to and from camp. At one point, Ortiz recalled how she and other FARC members even ate lunch at Martinez Vega's house. Given all that, the reference to a photo array was just gilding the lily.

Second, even if the jury had completely disregarded Garrido and Ortiz as unreliable witnesses, multiple other witnesses provided similar testimony. For example, like Ortiz, Mauricio Parra Diaz repeatedly identified Martinez Vega as "Chiguiro" and testified that he saw him transporting cocaine and weapons for the FARC. Parra Diaz also confirmed, as did Ortiz, that Martinez Vega carried a pistol—something only guerillas and drug traffickers were permitted to do in the 16th Front—and testified that he was present when Front Leader Negro Acacio announced the news of Martinez Vega's arrest. Likewise, Eugenio Vargas Perdomo identified Martinez Vega as "Chiguiro," and testified that they lived and worked together, trafficking cocaine and buying uniforms, weapons, and ammunition for the 16th Front. And Luis Restrepo testified that Martinez Vega was "Chiguiro,"

and that he witnessed Martinez Vega repeatedly exchange weapons for cocaine with Negro Acacio.

Garrido's testimony, too, generally reiterated other evidence at trial. Garrido explained that Martinez Vega, during his extradition flight to the U.S., stated that his nickname was "Chiguiro" and described having moved several tons of cocaine, weapons, and supplies for the FARC. But Carlos Gonzales Jaramillo, a colonel in the Colombian army, also testified that Martinez Vega made similar confessions to him, including that he was "Chiguiro" and that he transported several tons of cocaine, as well as uniforms and weapons, for the FARC.

Accordingly, looking at the evidence in the record as a whole, there is no "reasonable likelihood" that the photo-array segment of Garrido's testimony, even if false, could have altered the outcome of the case. *Cf. Giglio*, 405 U.S. at 154–55 (reversing where "the Government's case depended almost entirely on [the perjuring witness's] testimony; without it there could have been no indictment and no evidence to carry the case to the jury"). Because the false testimony was not material, the district court's refusal to grant a mistrial or a new trial was not an abuse of discretion.

## B. Missing-Evidence Instructions

Another government witness, Mauricio Parra Diaz, testified to being shown photographs at the U.S. Embassy in Colombia by the DEA and selecting Martinez Vega as "Chiguiro." Outside the presence of the jury, DEA Special Agents Cesar Medina and Daniel Dyer testified that a photo array had been shown to numerous potential witnesses in Colombia. However, the agents had no specific recollection of the people who were shown the array, and the Government kept no record of that information or of any identifications the

witnesses made. In fact, Medina confirmed that "the understanding" within his office was that he "would keep no record of this," but simply call Dyer in the event of an identification, J.A. 1000, and Dyer, for his part, acknowledged that he did not make records of such calls. Medina also testified that the photo array he used was kept in a folder in the DEA's Bogotá Country Office, but that he believed it had since been shredded because the office "shred[s] the photo arrays, because it is not needed any more for that particular interview [*sic*]." *Id.*

In light of that testimony, Martinez Vega requested the following jury instruction:

> Both Ms. Ortiz and Mr. Parra Diaz have testified that they were shown photographs of individuals at the United States Embassy in Bogota and that they identified a photograph of Martinez Vega as that of the person they have each identified as "Chiguiro." The United States has no records or other information that would corroborate this testimony. If photographs were shown to the witnesses for purposes of identification, the Government would be obligated to preserve such photographs, as well as any record of what the witnesses may have said at the time of their identifications. The United States has no such photographs or records.

J.A. 1054.

A third witness, Luis Restrepo, testified that he was shown photographs that "included . . . Mr. Chiguiro," whom he identified in court as Martinez Vega. J.A. 1191. Garrido testified that he showed Restrepo a photo array depicting Martinez Vega and that he "thought [the photos] were filed in

the case folder." *Id.* at 1362. Again, no such photographs were produced by the Government.

Martinez Vega requested another instruction regarding Restrepo's identification:

> If photographs shown to Mr. Restrepo in this case were only within the power of the government to produce, and were not produced by the government, and their absence has not been sufficiently explained, then you may, if you deem it appropriate, infer that the photographs would have been unfavorable to the government.

J.A. 1054–55. The district court declined to give either instruction, citing no evidence of bad faith on the part of the Government regarding the loss or destruction of the photographs and the fact that "these were not really identification procedures" in which the "only way [the witnesses] could ever identify" Martinez Vega was through the photo array. *Id.* at 1698–1700.

The district court's decision withholding a missing-evidence instruction is reviewed for abuse of discretion. *United States v. West*, 393 F.3d 1302, 1309 (D.C. Cir. 2005), *abrogated on other grounds by Burgess v. United States*, 553 U.S. 124 (2008); *see also United States v. Tarantino*, 846 F.2d 1384, 1404 (D.C. Cir. 1998) (describing standard of review for denial of analogous missing-witness instruction). A missing-evidence instruction "is appropriate if it is peculiarly within the power of one party to produce the evidence and the evidence would elucidate a disputed transaction." *West*, 393 F.3d at 1309; *see also United States v. Williams*, 113 F.3d 243, 245 (D.C. Cir. 1997) (foundation for analogous missing-witness instruction). "When these two requirements are met, jurors may be instructed that the

controlling party's failure to produce the evidence permits them to draw the inference that the evidence would have been unfavorable to that party." *Id.*

Federal Rule of Criminal Procedure 16, the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland*, 373 U.S. 83 (1963), all impose duties on the Government to disclose certain materials and evidence to criminal defendants. In *United States v. Bryant*, 439 F.2d 642 (D.C. Cir. 1971), this court held that those duties to disclose included a correlative duty to preserve that evidence in the first place, since "[o]nly if evidence is carefully preserved during the early stages of investigation will disclosure be possible later," *id.* at 651. Accordingly, *Bryant* instructed that the Government must "promulgate[], enforce[] and attempt[] in good faith to follow rigorous and systematic procedures designed to preserve all discoverable evidence gathered in the course of a criminal investigation," or else risk the imposition of sanctions "for non-disclosure based on loss of evidence." *Id.* at 652.

Martinez Vega argues that, under *Bryant*, the Government was obligated to retain the photographs used in the witness identifications, as well as verbatim records of any statements the witnesses may have made at the time. The problem for Martinez Vega is that the Supreme Court's subsequent decision in *Arizona v. Youngblood*, 488 U.S. 51 (1988), narrowed the Government's constitutional obligations regarding the preservation of evidence. Specifically, the Court held that "the Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." *Id.* at 57. But if "no more can be said" about the evidence "than that it could have been subjected to tests, the results of which might have exonerated the defendant," there is no denial of due process

unless a criminal defendant can demonstrate the Government's bad faith. *Id.* at 57–58. *Youngblood* thus confines the Due Process Clause to superintending only those cases in which the missing evidence is material and exculpatory or in which "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id*. at 58.

Following *Youngblood*, this court has held that *Bryant*, at least with respect to due process claims based on missing evidence the exculpatory value of which is unclear, is "no longer good law." *In re Sealed Case*, 99 F.3d 1175, 1178 (D.C. Cir. 1996); *see also United States v. McKie*, 951 F.2d 399, 403 (D.C. Cir. 1991) (rejecting reliance on *Bryant* because "due process claims . . . are now governed by the standards enunciated in *Arizona v. Youngblood*").

Martinez Vega nonetheless argues that *Bryant* provides the relevant standard because his objection is grounded not in the general protections of the Due Process Clause, but in the Government's specific obligations under Federal Rule of Criminal Procedure 16, the Jencks Act, and *Brady*.[7] Alternatively, Martinez Vega contends that, even under *Youngblood*, missing-evidence instructions were warranted because the Government's bad faith can be inferred. Specifically, despite every incentive to maintain careful records of the identifications for subsequent use at trial, the

---

[7] Whether *Youngblood* forecloses the application of *Bryant* in the context of Jencks Act claims is unsettled. *See McKie*, 951 F.2d at 403 (leaving unaddressed "the continuing vitality of *Bryant* in its original context regarding claims under the Jencks Act"). *But see United States v. Thomas*, 97 F.3d 1499, 1503 (D.C. Cir. 1996) (noting that "the actual holding in [*Bryant*] did not rest on the Jencks Act" since "the court did not decide that the missing [evidence] constituted a Jencks Act statement").

DEA agents kept no such documentation. Martinez Vega emphasizes that the exculpatory value of the untested physical evidence in *Youngblood* was unknown to the agents. *See* 488 U.S. 56 n.* (noting that the defendant "has not shown that the police knew the [missing evidence] would have exculpated him when they failed to" preserve it). Here, by contrast, the agents necessarily knew the results of their photo-array presentations and thus had actual knowledge whether such documents were actually (and not just potentially) exculpatory. The conspicuous absence of evidence with clearly "knowable" exculpatory value, Martinez Vega concludes, points strongly to bad faith, especially given that the same DEA agents apparently preserved marked photo arrays used in identification procedures conducted with other individuals.

The Government's failure to retain records for witness identifications—records for which the inculpatory or exculpatory value seems obvious—is troubling. But even assuming *Youngblood* applies, the erroneous denial of a missing-evidence instruction will not require reversal if the error is harmless. *See United States v. Glenn*, 64 F.3d 706, 710 (D.C. Cir. 1995). And in that regard, Martinez Vega fails to identify how that mistake affected his defense or had a substantial and injurious effect on his trial. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Indeed, Martinez Vega's identity as "Chiguiro" was established by the testimony of multiple witnesses based on in-person observations and interactions, wholly independent of the missing photo arrays. *See, e.g.*, *supra* pp. 21-22. Accordingly, any error by the district court in declining to issue missing-evidence instructions was harmless.

## C. The "Chiguiro" Photograph

Six weeks before trial, the Government turned over a document obtained from Colombian Military Intelligence. The document is a printout of a PowerPoint-type slide containing photographs of four men. Three of the men are labeled FARC commanders in the 16th Front. The fourth photograph shows a person (not Martinez Vega) in full military uniform and is labeled "Angel Leopoldo Lopez, aka Chiguiro." J.A. 1786.

At trial, the Government called Major Guillermo Rios, Colombian Military Intelligence's "chief of analysis" for the 16th Front, who testified that the only names associated with "Chiguiro" that the Colombian military had in "the files [he] looked [at]" and "in the files that [he] received" were "Juan Jose Martinez Vega" and "Gentil Alvis Patiño." J.A. 1149.[8]

On cross-examination, the defense showed the printout with the "Chiguiro" photo to Rios, but he denied ever having seen it before. Martinez Vega then filed a motion seeking all exculpatory evidence pertaining to the printout. A few days later, the Government advised Martinez Vega by letter that the slide from which the printout came had been found in an electronic storage file of the DEA Bogotá Country Office, but that none of the current agents of that office could identify its origin. However, agents who had previously worked in the office stated that the slide was given to them by Colombian intelligence around 2001 in the context of large transmissions

---

[8] The indictment charged Martinez Vega under the aliases of "Gentil Alvis Patiño" and "Chiguiro," but the defense demonstrated that Patiño was another individual with ties to other alleged FARC leaders, and the Government eventually stipulated that Colombian identification documents existed for a different individual named Patiño.

of information on FARC members. The letter further explained that the Government's contacts with the Colombian military and intelligence were also unaware of the origin of the "Chiguiro" photograph, the slide, or the information on the slide.

Martinez Vega argued that it was misleading for the Government to ask Rios about his "files" and elicit that no other person had been identified as "Chiguiro" when the Government "knew that, at some point in time, an agency of Colombian Military Intelligence which reported to the office occupied by Rios, had reached the opposite conclusion." J.A. 1381. Martinez Vega therefore proposed that the following stipulation be provided to the jury:

> The parties stipulate that Defendant Martinez [*sic*] Exhibit 3 is a document which was found in an electronic storage file of the Drug Enforcement Administration's Bogota Country Office. It is believed that it was transmitted, as part of a larger transmission of information, by Colombian Military Intelligence in or around 2001. The DEA has no further information about the origin of the document, the photographs contained on it, or accuracy of the captions to the photographs.

*Id.* The Government refused to so stipulate. The court also declined to admit the printout from the slide into evidence since it had not been identified by any witness and had not been verified or authenticated in any way. *Id.* at 1688–89.

In his motion for a new trial, Martinez Vega argued that the Government's delayed disclosure of the printout "at a time and under circumstances when Defendant could not ascertain the factual basis for the document" violated *Brady*. J.A. 1780. He also argued that the Government compounded the breach

by questioning Major Rios in a misleading way, and that the district court failed to remedy those infractions. The court denied the motion, finding that the printout and the sought-after information were not material.

We review the district court's denial of a motion for a new trial for abuse of discretion, but evaluate *de novo* the court's assessment of whether the Government breached its obligations under *Brady*. *See United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007).

The district court did not err in denying a new trial because there is no reasonable prospect that earlier disclosure of the printout or any additional information about it would have affected the trial's outcome. *Brady* requires the Government to disclose, upon request, "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment." 373 U.S. at 87. The "touchstone of materiality" is "'a reasonable probability' of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678). The bottom-line question "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. "A 'reasonable probability' of a different result" turns on whether the Government's suppression of evidence "'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678).

In this case, for evidence that there was another "Chiguiro" affiliated with the FARC to have made any difference, the Government's case would have to be heavily reliant on Martinez Vega's use of the nickname. But the record evidence bucks that notion. Multiple witnesses who

knew Martinez Vega—either as "Chiguiro" or not—identified him repeatedly in person and testified to seeing him transporting weapons or cocaine and interacting with leaders of the 16th Front. The district court found that those witnesses "did not have fleeting glimpses of the defendant." J.A. 2145. Rather, "they worked with him, ate meals with him, and even lived with him," leaving "little room for doubt about the reliability of their identifications of him as the person they observed engaging in conspiratorial acts." *Id*. Those witnesses personally knew Martinez Vega and observed him in the relevant circumstances. For those witnesses, the name that Martinez Vega went by was largely beside the point. Thus, any revelation that another individual affiliated with the FARC was also referred to as "Chiguiro" would not plausibly have had any effect on the outcome of the trial.

## D. Prior Inconsistent Statement

Colonel Ignacio Gonzales Jaramillo of the Colombian military testified that he interviewed Martinez Vega in a Venezuelan prison. According to Gonzales Jaramillo, Martinez Vega denied being involved in the FARC during the initial portion of the interview, which was videotaped. But after the video camera was turned off, Martinez Vega allegedly began admitting his involvement with the organization. Gonzales Jaramillo testified that the camera was off for "20, 25 minutes, maybe half an hour" during the interview. J.A. 1116.

Following the interview, the Colonel documented the details of the interview. In pertinent part, his report states:

> Upon asking [Martinez Vega] about his ties to kidnapping and drug trafficking, he denied all involvement at any time. . . .

> The interview continued on the same line for almost 2 hours, denying his relationship with the terrorist organization and denying his ties to kidnapping and drug trafficking.
>
> As the conversation progressed, facts from his past life were brought up, thanks to information obtained by intelligence work and, in other cases, supplied by the informant who accompanied the delegation. The presentation of facts made the subject begin to contradict himself.

J.A. 1479.

During cross-examination, defense counsel confronted Gonzales Jaramillo with the apparent contradiction between his testimony that Martinez Vega was cooperative during the 20 or 30 minutes that the camera was off, and the report's statement that Martinez Vega denied any connection to the FARC for nearly two hours. The Colonel explained that the two-hour period referred to the entire time he was with Martinez Vega "from the first moment I saw him until we started talking because until the cameras were off, we didn't start a conversation." J.A. 1119; *see also id.* at 1120 ("Yes, from the first time we saw each other until about—until we sat down. Less than two hours, but yes, that's how it was.").

Martinez Vega moved to admit into evidence a copy of Gonzales Jaramillo's interview report as a prior inconsistent statement. He contends that, because the videotaped portion of the interview did not get into the subject of the FARC, drugs, or kidnapping, the two-hour discussion of those topics necessarily did not begin until after the camera was turned off.

The district court denied the motion, finding that it was "not clear" that the interview report amounted to a prior inconsistent statement since it was ambiguous whether "the two hours" in the report referred to the length of the entire interview, or only the time during which the camera was turned off. J.A. 1682. The court also noted that "the jury has heard at length . . . what allegedly the report said" during cross-examination of Gonzales Jaramillo, *id.*, and expressed concern that the report elsewhere contained "exculpatory statements of the defendant not subject to cross-examination," *id.* at 1683.

The district court's admission or exclusion of evidence is reviewed for abuse for discretion. *See United States v. Morgan*, 581 F.2d 933, 936 (D.C. Cir. 1978). Federal Rule of Evidence 613(b) permits the use of a witness's prior inconsistent statement for impeachment "if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it." While "direct contradiction is not essential," the trial court "has discretion in determining whether testimony is inconsistent with a prior statement." 28 Wright & Gold, Federal Practice & Procedure, § 6203 (2d ed. 2012); *see Grunewald v. United States*, 353 U.S. 391, 423 (1957) ("[T]he question whether a prior statement is sufficiently inconsistent to be allowed to go to the jury on the question of credibility is usually within the discretion of the trial judge.").

The district court did not abuse its discretion in concluding that there was no material inconsistency between Gonzales Jaramillo's report and his testimony. Gonzales Jaramillo clarified on cross-examination that, although he did not explicitly inquire about the FARC, drugs, and kidnapping during the videotaped portion of the interview, he did ask Martinez Vega why he had been arrested in Venezuela. J.A.

1489–90 ("Why do they have you here?"; "Where did they nab you?"; "Alright, but why? In other words, the Venezuelan authorities arrived and what were you doing at the time?"). In response, Martinez Vega denied knowledge as to why the police had picked him up. *Id.* ("I don't know. They nabbed me at the farm where I was working and brought me here."; "I was fixing something of a pool and some kiosks."). Martinez Vega's responses to additional questions about his presence and activities in Venezuela were likewise vague and noncommittal. *Id.* at 1492 (Q: "How long have you been in Venezuelan territory?" A: "Since last year." Q: "Can you please be more precise . . .?" A: "I don't remember exactly." . . . Q: "Beginning of the month . . . beginning of the year." A: "When a man brought me here to get papers and help him work." Q: "What man"?); *id.* at 1494 (Q: "Did you go to Caracas?" A: "In a car." Q: "In a car? With whom?" A: "With that man." Q: "What's the man's name?" A: "Alberto." Q: "What does Alberto look like? . . . Alberto what?" A: "I don't know his last name."). Martinez Vega was also cagey about a wound in his neck, stating at first that it was from an operation, then explaining that he had been shot, but by whom he did not know.

Those kinds of unresponsive exchanges are reasonably consistent with testimony that Martinez Vega "did not accept—he didn't volunteer his information as to his FARC membership," J.A. 1119, and that "he did deny his participation . . . [h]e kept saying that he had nothing to do, he owed nothing*,"* *id.* at 1120. They are also not inconsistent with the general statement in the report that Martinez Vega denied his relationship to the FARC or any involvement in kidnapping and drugs for two hours, particularly since he had been arrested in Venezuela for those very things.

Accordingly, the district court did not abuse its discretion in determining that the report was not a prior inconsistent statement and declining to admit it under Rule 613(b). Moreover, even if the exclusion of the report were error, it was harmless given that any perceived contradiction between the contents of the report and the Gonzalez Jaramillo's testimony was fully aired for the jury during cross-examination. *See United States v. Davis*, 181 F.3d 147, 149 (D.C. Cir. 1999) (evidentiary exclusion harmless because, "during the cross-examination of [the witness] the jury heard word-for-word what he said at the suppression hearing" and therefore the court's refusal to admit the transcript "in no way prejudiced [defendant] or impaired his defense"); *United States v. Bogle*, 114 F.3d 1271, 1275 (D.C. Cir. 1997) (court's refusal to exclude prior written statement of witness was "clearly harmless" where defense was able to impeach the witness about the statement on cross-examination).

### E.  Sentencing Enhancement

At sentencing, the district court increased Martinez Vega's base offense level by three for being a "manager or supervisor" in the narcotics conspiracy.  Martinez Vega challenges the enhancement for lack of evidence that he supervised other participants in the conspiracy.

In reviewing a sentencing decision, "[p]urely legal questions are reviewed *de novo*; factual findings are to be affirmed unless clearly erroneous; and we are to give due deference to the district court's application of the [sentencing] guidelines to facts." *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008) (internal quotation marks omitted). The Government must demonstrate that a sentencing enhancement is warranted by a fair preponderance of the evidence, *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C.

Cir. 1997), though that evidence may be circumstantial, *United States v. Graham*, 162 F.3d 1180, 1183 (D.C. Cir. 1998).

Section 3B1.1 of the Sentencing Guidelines permits the district court to increase a defendant's base offense level due to his "aggravating role" in an offense. U.S.S.G. § 3B1.1. "The magnitude of the enhancement varies with the culpability of the defendant," *Graham*, 162 F.3d at 1182–83, as well as the scope of the criminal activity. As relevant here, a defendant is subject to a three-level increase for being "a manager or supervisor (but not an organizer or leader)" of a criminal activity that "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b); *see Graham*, 162 F.3d at 1183.

The commentary to Section 3B1.1 instructs the sentencing court to consider several factors in determining whether to apply an enhancement, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 application note 4.

"Mere control over a scheme rather than over a *participant* in a scheme" is not enough to warrant an aggravating role enhancement. *Bapack*, 129 F.3d at 1324 (internal quotation marks omitted). Instead, the guidelines require that "the defendant must have been the organizer, leader, manager or supervisor of one or more *participants*" in the criminal activity. U.S.S.G. § 3B1.1 application note 2 (emphasis added). A "participant" is a "person who is

criminally responsible for the commission of the offense, but need not have been convicted." *Id.* § 3B1.1 application note 1. An individual is "'criminally responsible' under § 3B1.1 only if 'he commit[s] all of the elements of a statutory crime *with the requisite mens rea.*'" *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001) (quoting *Bapack*, 129 F.3d at 1325). "This does not mean, however, that to qualify as a 'participant' a person must be found criminally responsible as a principal or culpable in the *same* crime of which the supervising defendant was convicted." *Bapack* 129 F.3d at 1325 (emphasis added). Instead, "a party who gives *knowing aid in some part* of the criminal enterprise is a 'criminally responsible party.'" *Id.* (quoting *United States v. Hall*, 101 F.3d 1174, 1178 (7th Cir. 1996)) (emphasis added).

Accordingly, to justify the three-level managerial-role enhancement, the Government had to prove by a preponderance of the evidence that Martinez Vega (i) managed or supervised (ii) at least one "participant" who was criminally responsible for an offense (iii) in a criminal activity that involved five or more participants or was otherwise extensive. The district court adequately assessed the first element, but failed to make the required findings on the second and third elements.

As to the first element, the district court pointed to record evidence showing that Martinez Vega "had significant responsibility given to him by the leadership of the FARC" and exercised "decision-making authority on selling these drugs, and transferring them for weapons and getting the weapons." Sentencing Tr. 45–46. The court recounted the testimony of Parra Diaz, which had "suggest[ed] that the defendant may have a troop" and had described "Mr. Martinez Vega as having guards . . . suggest[ing] that there were many supervised." *Id.* at 40. The court also relied upon

Ortiz's testimony to the effect that "the person in charge of that group of drivers and all was 'Chiguiro,' that is the defendant," *id.* at 42, and Restrepo's testimony that "the defendant was like our commander, our immediate commander," and "the defendant actually assigned them where to go," *id.* at 42–43. The record thus amply supported the district court's conclusion that Martinez Vega had sufficient control and authority over other individuals to be a manager or supervisor.

But absent from the district court's analysis is any consideration of the second element necessary for the enhancement: whether any of the persons allegedly supervised by Martinez Vega qualified as a "participant" under Section 3B1.1. The parties specifically contested that issue at the sentencing hearing. The Government asserted that "any individuals who are engaged in moving cocaine and weapons to a guerilla group in the jungles in Colombia would have, by definition, been aware of the criminal nature of the their activities, and they would have been participants as understood by the guidelines." Sentencing Tr. 26. Martinez Vega countered that the Government had not shown that the workers who helped him load and unload sacks would have known that the sacks contained cocaine base or that it was being exported to the United States. *Id.* at 37. The district court, however, did not address the issue and made no finding that one or more of those supervised individuals had the requisite criminal *mens rea* and culpability to count as "participants."[9]

The district court's assessment of the third element also came up short. The court found that Martinez Vega's

---

[9] Martinez Vega argues (Br. 71) that "participants" must have "the *same* culpable *mens rea*" as their supervisor. *Bapack* holds otherwise. 129 F.3d at 1325.

"activities were otherwise quite extensive in this area" of "transport[ing] . . . narcotics and weaponry." Sentencing Tr. 47. But the Guidelines' "otherwise extensive" inquiry pertains to the scope of the *criminal activity* as a whole, not the defendant's particular involvement in it. *See* U.S.S.G. § 3B1.1(b) (asking whether "the *criminal activity* involved five or more participants or *was otherwise extensive*") (emphasis added). That is, the criminal activity must either involve "five or more participants" or be "otherwise extensive" in that it involves fewer than five criminally culpable "participants," but could include a number of "unknowing outsiders." *United States v. Wilson*, 240 F.3d 39, 49 (D.C. Cir. 2001) ("otherwise extensive" demands "a showing that an activity is the *functional equivalent* of an activity involving five or more participants") (citation omitted). On that point, the district court made no finding.

Accordingly, we vacate Martinez Vega's sentence and remand to the district court for resentencing in view of the legally required elements for a "manager or supervisor" enhancement. In so doing, we reach no conclusion as to the sufficiency of the existing record on those issues, but emphasize that the review on remand is constrained to the existing record.[10]

### III. Issues Raised by Cuevas

Cuevas raises five arguments specific to the case against him, namely, that the district court (i) should have granted

---

[10] Martinez Vega also asserts that he was eligible for a two-level reduction as a "minor participant" under Section 3B1.2 of the guidelines. The district court declined the decrease, finding sufficient evidence that Martinez Vega played a significant role in the conspiracy, Sentencing Tr. 45–46, and on this record we find no error in that ruling.

Cuevas's motion for a mistrial after Garrido testified about a previously undisclosed conversation he had with Cuevas; (ii) should not have admitted into evidence recordings of Cuevas's phone calls; (iii) violated the Confrontation Clause by limiting Cueva's questioning of cooperating witnesses; (iv) wrongly permitted the exhibition of a video depicting a police raid; and (v) erroneously applied sentencing enhancements for being a manager or supervisor and for possession of a firearm. None has merit.

## A. Garrido's Reference to Cuevas as "Mincho"

Throughout the trial, the Government alleged, and Cuevas denied, that Cuevas was the FARC's prominent cocaine manufacturer known as "Mincho." After two witnesses had identified Cuevas as Mincho, the Government called Garrido to testify about Cuevas's extradition. The following exchange occurred:

> Q: When did you first encounter Mincho, or the defendant Cuevas Cabrera that day?
>
> A: I went inside that area while he was being processed by the Colombian authorities. I went in. I asked, "Are you Mincho?" He said, "Yes." I verified his name. Erminso Cuevas Cabrera.

Cuevas objected to the testimony on the ground that Cuevas's alleged statement to Garrido had not been disclosed during discovery, and he requested that the testimony be stricken. The court sustained the objection and issued the following instruction to the jury:

> Ladies and gentlemen, Agent Garrido mentioned that when he spoke to Mr. [Cuevas] Cabrera, he

asked him if he was Mincho, and he said, yes, I am Mincho. I am going to strike that testimony. That was not previously announced as evidence in the case about any statements that Mr. Cabrera may have made that he was Mincho. So I am going to strike that from the testimony, have you disregard that statement by—allegedly made by Mr. Cabrera.

Cuevas nevertheless moved for a mistrial, which the district court denied. Cuevas now argues the denial was error because the testimony was highly prejudicial and because the court's curative instruction, by repeating the offending testimony and by implying its exclusion was due only to a technicality, exacerbated rather than mitigated the prejudice.

A "mistrial is a severe remedy—a step to be avoided whenever possible, and one to be taken only in circumstances manifesting a necessity therefor." *United States v. McLendon,* 378 F.3d 1109, 1112 (D.C. Cir. 2004). The district court's principal consideration in ruling upon a motion for mistrial is the extent of prejudice suffered by the defendant, and we review the district court's denial only for abuse of discretion. *Id.*

In this case, it is not obvious why Garrido's stricken testimony was prejudicial considering that at least two other witnesses previously had identified Cuevas as "Mincho," and the evidence established that "Mincho" is a common nickname for Erminso. Further, whatever harm may have been done by the testimony was promptly undone by Judge Hogan's curative instruction. "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions." *Greer v. Miller*, 483 U.S.

756, 766 n.8 (1987) (internal quotation marks and citation omitted).  Neither Judge Hogan's repetition of the offending testimony (which was necessary to specify the objectionable content for the jury after numerous intervening questions) nor his stated reason (which was no more technical than any other evidentiary ruling) created such an "overwhelming probability" here.

## B.  Admission of Cuevas's Phone Calls

In 2004 a federal judge in the Southern District of Florida authorized telephone wiretaps based upon a DEA agent's affidavit stating that the "target telephones will be located overseas" and that the "intercepts will be conducted from, and monitored in, the Southern District of Florida."  A confidential DEA source then provided the monitored phones to targets in Colombia.  The Government intercepted Cuevas discussing his operations on two calls, which it played at trial during the testimony of the other party to the recorded calls.

Cuevas argues the tapes were inadmissible because federal law prohibits foreign surveillance and because the federal judge who approved the wiretaps lacked jurisdiction to do so.  Cuevas forfeited these arguments by failing to raise them in the district court, so we consider them at most for plain error.  *United States v. Williams*, 773 F.3d 98, 105 (D.C. Cir. 2014); *see also United States v. Burroughs*, 810 F.3d 833, 837–38 (D.C. Cir. 2016).

First, Cuevas's contention that extraterritorial surveillance is prohibited because "Title III . . . has no extraterritorial force" reflects a fundamental misunderstanding of the role of the statute.  Title III of the Omnibus Crime Control and Safe Streets Act of 1968 "imposes . . . limitations on the use of electronic

surveillance." *United States v. Chavez*, 416 U.S. 580, 580 (1974). If it does not apply extraterritorially, then government surveillance outside the United States is unconstrained, not forbidden, by Title III.

Second, Cuevas's contention that a "listening post" in the Southern District of Florida was insufficient to confer jurisdiction upon the federal court there is unavailing if only because every circuit that has considered the question has deemed a listening post sufficient. *See, e.g., United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006); *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992). With no "controlling precedent" or "other absolutely clear legal norm" to support Cuevas's position, the purported error by the district court, if error it be, cannot be deemed plain. *See United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011).

### C. Cross-Examination of Cooperating Witnesses

At trial, former members of the FARC testified for the Government.[11] Cuevas learned that these witnesses wore monitoring devices on their ankles both for their own safety and to prevent them from fleeing and illegally remaining in the United States. Cuevas sought to cross-examine the witnesses about the devices on the ground that they revealed potential bias. After consulting with the U.S. Marshal Service, the district court found the anklets were "a security practice used with many witnesses," and were not being used because the witnesses were "under charges or otherwise untrustworthy." The court concluded that the devices had "no

---

[11] These witnesses were known as "reinsertados" because they had been reintegrated into civil society through a Colombian government program that grants members of the FARC immunity for past crimes in exchange for cooperation with law enforcement.

relevance" to the witnesses' credibility and that inquiry would "lead into other areas . . . far afield from what is relevant in this trial," such as the threat Cuevas himself posed to safety of the witnesses. Accordingly, the judge prohibited Cuevas from cross-examining the witnesses about the devices.

Cuevas argues the limitation violated the Confrontation Clause of the Sixth Amendment to the Constitution of the United States. Although that Clause guarantees a criminal defendant "the right . . . to be confronted with the witnesses against him," a district judge has

> wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). We review the district court's limitation of cross-examination for abuse of discretion, with the central inquiry being "whether the jury would have received a significantly different impression of the witness's credibility had defense counsel been permitted to pursue the [disallowed] line of questioning." *United States v. Wheeler*, 753 F.3d 200, 205 (D.C. Cir. 2014).

The district court did not abuse its discretion here. Questions about the devices would be of no incremental value to the defendant in this case, and the district court reasonably concluded that such questions would "stray far afield from what [was] relevant in this trial." The jury was already aware that all the former FARC members who testified were admitted participants in a cocaine trafficking organization;

that several had admittedly engaged in guerilla warfare; that some were admitted murderers; and that all had been spared prosecution in return for their cooperation with law enforcement. With all this laid bare, it is highly unlikely that questions about the monitoring devices would have left the jury with a "significantly different impression of the witness's" propensity to bias or motivation to lie on behalf of the Government. *Id.*

### D. Admission of the Video

At trial, Lieutenant Colonel Alvarez Ochoa of the Colombian National Police testified as an expert on Colombian cocaine laboratories and the organization of the FARC. Over Cuevas's objection, the Government introduced a video of a police raid, in which Alvarez participated, on a cocaine laboratory unconnected to Cuevas. The video depicted a typical cocaine lab in the jungle, the recovery of seven tons of cocaine "base," the demolition of the laboratory with explosives, and helicopters that provided armed air support. It is not clear from the testimony whether the video depicted any violent resistance from the operators of the laboratory, but Cuevas claims it did. Cuevas argues the video of a raid on a cocaine lab outside either defendant's territory was irrelevant and highly prejudicial, and it should have been excluded under Federal Rule of Evidence 403.

Rule 403 permits exclusion of otherwise admissible evidence if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." We review a district court's determination under Rule 403 "with great deference, reversing only for grave abuse of discretion." *United States v. Clarke*, 24 F.3d 257, 265 (D.C. Cir. 1994). In this case, Cuevas has failed even to offer any account of how the video

caused him any prejudice, let alone sufficient prejudice to say the district court gravely abused its discretion.

### E.  Sentencing Enhancements

Cuevas raises the same objection to the three-level "manager/supervisor" sentencing enhancement as does Martinez Vega, namely that the district court erred in applying the enhancement because there was insufficient evidence of the culpability of anyone Cuevas supervised. Unlike Martinez Vega, however, Cuevas was expressly found by the district court to have supervised numerous culpable individuals.  We are bound by this factual finding unless it is clearly erroneous, *see United States v. Henry*, 557 F.3d 642, 645 (D.C. Cir. 2009), which it is not.  The evidentiary record here, including Maria Santiago's testimony that she worked alongside 80 employees in a cocaine laboratory run by Cuevas, supports the court's finding.

Cuevas also objects to the imposition of a two-level enhancement, pursuant to U.S.S.G. § 2D1.1(b)(1), for possession of a firearm during a drug offense.  The district court, however, expressly found that Cuevas carried a weapon while running the lab, and this finding is far from clearly erroneous.  Two witnesses testified to having seen Cuevas carry a handgun while committing drug offenses.  Cuevas challenges the credibility of those witnesses, but the "district court's credibility determinations are entitled to the greatest deference from this court on appeal." *Carter v. Bennett*, 840 F.2d 63, 67 (D.C. Cir. 1988).  Cuevas gives us no basis for disturbing the court's finding.

## IV.  Conclusion

We affirm the convictions of Juan Martinez Vega and Erminso Cuevas Cabrera.  We also affirm Cuevas's sentence, but we vacate Martinez Vega's sentence and remand to the district court for resentencing consistent with this opinion.

*So Ordered*